UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **TOM SAWYER PRODUCTIONS, INC.** )<br>**Plaintiff,** )<br> )<br>**v.** )<br> )<br>**PROGRESSIVE PARTNERS** )<br>**ACHIEVING SOLUTIONS, INC., <u>et. al.</u>** )<br>_____ ) | **Case No.:1:07CV01304**<br>**Judge: Rosemary M. Collyer** |

---

## DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(5), 12(b)(2), and 12(b)(6), OR, IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

This case must be dismissed because of multiple dispositive and procedural

flaws.  Service of process on each Defendant is deficient, the Court lacks personal

jurisdiction over Renata Roy and the claim itself should have been, but weren't brought

as compulsory counterclaims in a Superior Court case filed seven months prior to the

filing of this case.  Substantively, it is undisputed that the termination of the contract

upon which this claim is brought is wholly unrelated to any of the conduct alleged to

have been undertaken by either of the Defendants.  Moreover, the Complaint itself fails to

meet the minimum pleadings requirements for the single count claim of intentional

interference with contract.

## II.    STATEMENT OF PROCEEDINGS

This case commenced with the filing of a Complaint (docket # 1, hereinafter #__)

on July 23, 2007.  Defendants' were purportedly served on the same day at the

conclusion of a deposition in the related case of _Portfolio Management Group, Ltd., et._

_al. v. Tom Sawyer Co.,_ No.   034-07, currently pending in the Superior Court for the

District of Columbia (hereinafter, the "Superior Court Action"). On August 9, 2007, Defendants' counsel wrote to Plaintiff's counsel asking for consent to a motion to extend the time within which to respond to the Complaint. That request was ignored by counsel for Plaintiff. On August 10, 2007, counsel for Defendants filed a Motion for an Extension of Time to Respond to the Complaint (#5). Despite Plaintiff's silence, this Court granted that motion on August 13, 2007, giving Defendant until September 28, 2007, to respond to Plaintiff's Complaint. In the meantime, on August 10, 2007, counsel for Defendants again wrote to Plaintiff's counsel as follows:

> I have had serious concerns with the propriety of the complaint you filed in the above captioned case against my clients. In fact, at the time the complaint was filed, I was sure that you did not investigate the facts alleged nor the possibility that the complaint would be barred under the compulsory counter claim rules. Having spoken to several people in the office of civil rights in the Federal Highway Administration, I am now certain that the complaint is groundless. Since you have no good faith basis to maintain this action against my clients, I demand that you dismiss this case immediately. I invite you to review the enclosed declaration[1].
>
> If you do not dismiss the complaint by close of business on August 13, 2007, I will be forced to draft and serve a Rule 11 Motion on you. If I have to draft such a motion, I will seek attorney's fees and sanctions. Please let me hear from you with regard to your intentions.

On August 13, 2007, an assistant in Plaintiff's counsel's office responded to the August 10, 2007, letter stating that "Mr. Love is away on vacation until August 15, 2007. Upon his return to the office, [he] will confer with his client regarding your request…and reply as soon as possible." To date, no reply has been received.

---

[1] The declaration attached to counsel's August 10, 2007, letter is attached hereto as DX 8.

III.    **STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

The Parties

Plaintiff, Tom Sawyer Company (hereinafter "TSC" or "Plaintiff"), is a corporation organized under the laws of the State of South Carolina, licensed to do business and doing business in the District of Columbia.  Federal Court Complaint at I (hereinafter "Compl.").

Defendant, Progressive Partners Achieving Solutions, Inc. (hereinafter, "PPAS") is a corporation organized under the laws of the State of Maryland, doing business in the District of Columbia.  Compl. at II.

Defendant, Renata Roy, resides in Prince Georges County Maryland.  Compl. at III.

Relationship of the Parties

In or around 2005, PPAS, along with another company Portfolio Management Group, Ltd., (hereinafter "PMG") began marketing the Federal Highway Administration (hereinafter "FHWA") to acquire an 8(a), Small Business Administration (hereinafter "SBA") contract for providing services connected with a National Civil Rights Summit to be held by FHWA, Office of Civil Rights. A true and correct copy of the Declaration of Renata Roy at 13, (hereinafter, "Roy Dec.") is attached hereto as DX 1 and is adopted and incorporated herein by reference for all purposes; A true and correct copy of the Superior Court Complaint at 9 (hereinafter, the "Sup. Ct. Compl."), is attached hereto as DX 2 and is adopted and incorporated herein by reference for purposes.   During a marketing meeting at FHWA in or around July or August of 2005, a representative of FHWA suggested to PMG and PPAS that they contact Carolyn Sawyer, (hereinafter

"Sawyer") the President of Tom Sawyer Company (hereinafter "TSC" or "Plaintiff") in order to work with TSC on the FHWA project for a specific component. Roy Dec. at 14; Sup. Ct. Compl. at 10. Shortly thereafter Roy contacted Sawyer, via telephone, and scheduled a face to face introduction meeting. Roy Dec. at 15.

On August or about 17, 2006, A conference call was held with representatives of TSC and PMG, on behalf of PPAS, to discuss the possibility of teaming on the FHWA project. Roy Dec. at 16; Sup. Ct. Compl. at 12.

On August 31, 2005, PMG, PPAS and TSC, (collectively, "the teaming partners") through their respective representatives, entered into a Teaming Agreement (hereinafter "the Agreement") with PMG as the prime contractor, to pursue the FHWA contract. Roy Dec. at 17 and Exh. 1; Sup. Ct. Compl. at 13.

On November 2, 2005, PMG, PPAS and TSC, through their respective representatives, signed an addendum to the Agreement. The Addendum made TSC the prime contractor because PMG graduated from the 8(a) program and was no longer eligible to receive 8(a) SBA contracts. Roy Dec. at 18 and Exh. 2. Pursuant to clause 1 of the Agreement, as prime contractor, TSC assumed overall responsibility for the preparation and submission of the proposals for the project. Roy Dec. at 18; Sup. Ct. Compl. at 15. In addition, pursuant to TSC's responsibilities under the SBA contract TSC was solely responsible for collecting invoices for payment, revenues and making distributions of revenues to the other two teaming partners. Roy Dec. at 20; Sup. Ct. Compl. at 17.

Pursuant to clause 6 of the agreement, each teaming partner was to have the opportunity to achieve one third of the tasks and the associated yearly gross revenues,

less a one percent administrative fee for the prime contractor.  Roy Dec. at 21; Sup. Ct. Compl. at 19.

During September 2005, the teaming partners continued their marketing efforts at the FHWA.  PMG and PPAS developed a proposed contract budget, and hoped that they would receive the contract award by the end of the fiscal year.  Roy Dec. at 22; Sup. Ct. Compl. at 20.

In or around January 1, 2006, the teaming partners received the Request for Proposal (hereinafter "RFP") from FHWA.  Roy Dec. at 23; Sup. Ct. Compl. at 22.

In or around February 16, 2006, the teaming partners met with the FHWA contracting officer and contracting officer's technical representative and presented as a team and presented their combined compatibility statement, reviewed the statement of work and submitted a list of questions developed as a team.  Roy Dec. at 24; Sup. Ct. Compl. at 24.

On March 2, 2006, the teaming partners met again to review the final proposal to be submitted to FHWA..  PMG was responsible for the technical portion of the proposal; TSC was responsible for cost portion of the proposal and PPAS was responsible for preparing the payment schedule.  Roy Dec. at 25; Sup. Ct. Compl. at 25.   All three teaming partners put significant time and effort into the proposal and all three teaming partners reviewed and agreed upon the contents of the final submission to FHWA.  Roy Dec. at 26; Sup. Ct. Compl. at 26.   The final proposal was delivered to FHWA by all the teaming partners in or around March 2, 2006.  Roy Dec. at 27; Sup. Ct. Compl. at 27.

On April 4, 2006, the teaming partners attended and participated in cost negotiation with FHWA.  Roy Dec. at 28; Sup. Ct. Compl. at 28.

On April 27, 2006, FHWA awarded the contract to the teaming partners. The contract was numbered FH61-06-C-00016. Roy Dec. at 29; Sup. Ct. Compl. at 29.

On August 1, 2006, PPAS, through its counsel, wrote to TSC and PMG requesting an independent audit and financial accounting to review any money collected, any money spent, and all outstanding invoices. This request was ignored by TSC. A second request, PPAS, through its counsel again wrote to TSC and PMG requesting a financial accounting of all monies collected, monies spent, and all outstanding invoices in connection with the now terminated FHWA contract. That request was also ignored by TSC. Roy Dec. at 30; Sup. Ct. Compl. at 31.

On September 6, 2006, FHWA terminated the contract citing as its reason "convenience." Roy Dec. at 31; Sup. Ct. Compl. at 32; Deposition of Monica Brown at 58, Line 13-14, attached hereto as DX 3.

On October 24, 2006, TSC sent a letter to PMG and PPAS. The letter represented that the remaining balance in the FHWA account was being distributed one third to each of the teaming partners as final distribution of contract revenues. Roy Dec. at 32; Sup. Ct. Compl. at 34; Letter from TSC to PMG and PPAS dated October 24, 2006, a true and correct copy is attached hereto as DX 4.

On or about November 22, 2006, PPAS, through its counsel, wrote to TSC asking for, *inter alia*, a complete and full financial accounting of all monies collected, spent and received, including all back up documentation including, but not limited to, bank statements, invoices, check stubs, wire transfer receipts, correspondence and disbursements associated in any way with the contract and a basis and justification for the

calculations as set forth in the October 24, 2006, letter from TSC.  Roy Dec. at 33; Sup.

Ct. Compl. at 36.

On November 29, 2006, TSC responded in writing that "management was

reviewing the request and would be in touch."  Roy Dec. at 34; Sup. Ct. Compl. at 36.

To date, neither PPAS nor PMG has received a response.  Roy Dec. at 35; Sup. Ct.

Compl. at 37.

The Superior Court Action

On January 4, 2007, PPAS along with PMG filed a complaint in D.C. Superior

Court against TSC, alleging breach of contract and breach of fiduciary duty.  Roy Dec. at

36; DX2.  On or around March 5, 2007, TSC filed its Answer but failed to include any

counterclaims in the pleading.  Roy Dec. at 37; Superior Court Answer (hereinafter, the

"Sup. Ct. Ans."), a true and correct copy is attached hereto as DX 5, and is adopted and

incorporated herein for all purposes.

In June, 2007, all parties propounded Interrogatories and Document Requests.

TSC propounded Requests for Admissions.  Those requests were answered in July 2007.

On July 17, 2007, TSC produced Simanco Staley in response to a 30(b)(6) deposition

notice; DX 6.   On July 23, 2007, TSC took the 30(b)(6) depositions of PMG through

Monica Brown, DX 3, and PPAS' through Renata Roy, DX 7; Roy Dec. at 38.

Discovery is set to close on September 28, 2007.

The Current Action

At the conclusion of Ms. Roy's deposition, counsel for TSC served her with two

summons and complaints in this case.  One summons was directed at PPAS and the other

was directed at Ms. Roy personally.  Roy Dec. at 39.  The Complaint alleged one count,

Tortious Interference with Contractual Relations. Contrary to the allegations in the

Complaint and as Ms. Roy attests:

>    40.    Contrary to the allegations in the Complaint, neither PPAS nor I pursued
>    any course of conduct intending to disrupt the FHWA contract. In fact, as
>    explained above, PPAS was benefiting from the contract and had a financial
>    expectation of one-third of contract revenues.
>
>    41.    PPAS previously had been contracted by US DOT headquarters, for
>    similar services and has a successful track record for delivery of services. Being
>    that this is the same facility that houses the FHWA leadership team, PPAS'
>    business reputation has been negatively impacted due to the cancellation of the
>    FHWA contract.
>
>    42.    Neither PPAS nor I made any unauthorized communications with the
>    FHWA contracting officers. In fact all members of the team were encouraged to
>    openly communicate with the contract team at FHWA, by those members
>    themselves.
>
>    43.    Furthermore, all the teaming partners did in fact openly communicate with
>    the FHWA program and contracting officers, had meetings with them and were
>    authorized to do so by the program manager that was responsible for the contract
>    management and services being rendered.
>    DX 1.

In fact, Ms. Roy had some concerns with how the contract was being managed

which were discussed among all the teaming partners. DX 7 at 53. On July 21, 2006,

Ms. Roy sent an email to TSC and copied the reminder of the contracting team at FHWA,

along with PMG. *See* DX 1, Exh. 3. The e-mail attempted to clarify a request by the

FHWA to develop additional justification/proposal for regional conferences. *Id.* Ms.

Roy was concerned that only a portion of her previous response to the request by TSC

was communicated to the Government. *Id.* The e-mail went on to state that:

>    I am more than willing to fulfill all requirements in support
>    of the client's request …I sincerely apologize for any
>    confusion or discrepancies the e-mail information
>    forwarded by Ms. Sawyer may have caused since it was an
>    excerpt from the complete note. I look forward to being a

team member and a partner to support the program goals of
FHWA.

*Id.*; *see also,* DX 7 at 57-58, lines 10-22; 1-15.

It was never suggested that Ms. Roy or any of the team members did not have the authority to communicate with the contracting team. In fact, it was not uncommon for all the members of the team to meet, including PMG and PPAS and the client informed the team members that they wanted "open communications." DX 7 at 58-59, Lines 16-22; 1-14, DX 3 at 54-55, Lines 22; 1-7; 61-62, Lines 10-22; 1-11.

Furthermore, the Associate Administrator of the Office of Civil Rights at the FHWA, Frederick Isler, was the manager of the FHWA contract. Isler Dec. at 3, attached hereto as DX 8. As he attests:

3)  In my capacity as Associate Administrator of the Office of Civil Rights, I was the manager of the FHWA Contract referred in the Complaint (the "Contract"). I am familiar with the facts and circumstances surrounding the decision to terminate that Contract.

4)  As the Associate Administrator of the Office of Civil Rights and the manager of the Contract, I was the sole decision maker with regard to the determination of the need for the Contract, the final approval of the Contract and any decisions to terminate the Contract. No one else has the authority to make those decisions.

5)  I terminated the Contract on September 6, 2006.

6)  My decision to terminate the Contract on that day was not influenced in any way by the actions or inactions of either Progressive Partners Achieving Solutions, Inc. ("PPAS") or Renata Roy ("Roy"). As a matter of fact, my decision to terminate the FHWA contract had absolutely nothing to do with either PPAS or Roy at all.

DX 8.

Because none of these material facts are in dispute, the case must be dismissed.

IV.     **STANDARDS APPLICABLE TO MOTIONS TO DISMISS**

      A.     **Rule 12(b)(5) Motions**

The Court may dismiss a complaint for ineffective service of process. *See* Fed. R. Civ. P. 12(b)(5); *Simpkins v. District of Columbia,* 108 F.3d 366, 369 (D .C.Cir.1997). The law is clear that "[t]he party on whose behalf service is made has the burden of establishing its validity when challenged." *Light v. Wolf,* 816 F.2d 746, 751 (D.C.Cir.1987); *Norlock v. City of Garland,* 768 F.2d 654, 656 (D.C.Cir.1985) ("Once the validity of service of process has been contested, the plaintiff 'must bear the burden of establishing its validity." ') (quoting *Aetna Bus. Credit v. Universal Decor,* 635 F.2d 434, 435 (5th Cir.1981)); *Saez Rivera v. Nissan Mfg. Co.,* 788 F.2d 819, 821 (1st Cir.1986). To do so, the plaintiff must demonstrate that the procedure employed satisfied the requirements of the relevant portions of Rule 4 and any other applicable provision of law. *Light v. Wolf,* 816 F.2d 746, 751 (D.C.Cir.1987).   Valid service of process is necessary in order to assert personal jurisdiction over a defendant. *Mid-Continent Wood Products, Inc. v. Harris,* 936 F.2d 297, 301 (7th Cir.1991). A defendant's actual notice of the litigation is insufficient to satisfy the service of process requirements under Rule 4. *Id.; Whitehead v. CBS/Viacom, Inc.,* 221 F.R.D. 1, 3 (D.D.C.2004); *Baade v. Price,* 175 F.R.D. 403, 405 (D.D.C.1997).

      B.     **Rule 12(b)(2) Motions**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over a defendant.  *Mwani v. bin Laden,* 417 F.3d 1, 7 (D.C.Cir.2005); *Crane v. N.Y. Zoological Soc'y,* 894 F.2d 454, 456 (D.C.Cir.1990).  In

order to meet that burden under Rule 12(b)(2), a plaintiff must allege "specific facts upon which personal jurisdiction may be based," *Blumenthal v. Drudge,* 992 F.Supp. 44, 53 (D.D.C.1998), and cannot rely on conclusory allegations, *see GTE New Media Servs., Inc. v. BellSouth Corp.,* 199 F.3d 1343 (D.C.Cir.2000). When considering challenges to personal jurisdiction, the Court need not treat all of plaintiff's allegations as true and "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *United States v. Philip Morris Inc.,* 116 F.Supp.2d 116, 120 n. 4 (D.D.C.2000).

A court may exercise personal jurisdiction over a non-resident defendant in the District of Columbia "by finding specific jurisdiction based on conduct connected to the suit, or by finding general jurisdiction [over the party]." *Id.*; *see also Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 (1984). Under both specific and general jurisdiction, the exercise of personal jurisdiction must comply with constitutional due process. *See, e.g., GTE New Media Servs.,* 199 F.3d at 1347.

### C.    Rule 12(b)(6) Motions

In order to survive a motion to dismiss under Rule 12(b)(6), the complaint must contain '"a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 346 (2005) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Dismissal is proper when the plaintiff "fails to allege all the material elements of [its] cause of action." *Weyrich v. The New Republic, Inc.,* 235 F.3d 617, 623 (D.C.Cir.2001) (citation and internal quotations omitted). "[T]he court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in

the complaint." *Kowl v. MCI Commc'ns Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994)

(citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)).

Importantly, the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), clarified *Conley's* pleading standards for motion to dismiss. A complaint must be dismissed pursuant to Rule 12(b)(6) if it does not plead "enough facts to state a claim for relief that is plausible on its face." Plaintiffs must "nudge their claims across the line from conceivable to plausible" or else "their complaint must be dismissed." *Twombly*, 127 S.Ct. at 1974. Only then does the plaintiff satisfy the requirement to "give the defendant fair notice of what the …claim is and the grounds upon which it rests." *Id.* at 1964.[2]

## V.    STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Proc. 56(c). Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment. The adverse party's opposition must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.Pro. 56(e).

---

[2] Although *Twombly's* elevated pleading requirements were set forth in the context of an alleged antitrust conspiracy, this Court has applied *Twombly's* heightened pleading standard to several non-antitrust related claims. *See, e.g., Rattigan v. Gonzalez,* 2007 WL 1577855, at *6 (D.D.C. 2007) (applying *Twombly's* pleading standards in the context of an employment discrimination claim); *Hicks v. Ass'n of Am. Med. Colls.,* 2007 WL 1577841, at *2 (D.D.C. 2007) (applying *Twombly's* pleading standards to a claim of retaliatory employment termination); *Martens v. U.S.,* 2007 WL 2007580, at *1 (D.D.C. 2007) (applying *Twombly's* pleading standards in the context of claims allegeing IRS tax violations; and *Lowe v. DEA,* 2007 WL 2104309, at *2 (D.D.C. 2007) (applying *Twombly's* pleading standards in the context of a FOIA request).

The governing standards for the issuance of summary judgment were set by the Supreme Court in *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). In *Celotex,* the Court explicitly recognized that a full-blown trial is a drain on resources to be avoided if and when the non-moving party's position cannot be substantiated through affidavit or other competent means.  *Id.* at 327.  As the Court explained:

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.
> *Id.*  (citation omitted).

## VI.    CHOICE OF LAW

As this case is presently before the Court under diversity jurisdiction, the Court must apply the choice of law rules from the District of Columbia. *See Ideal Elec. Sec. Co. v. Int'l Fidelity Insur. Co.,* 129 F.3d 143, 148 (D.C.Cir.1997) ("When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit."). For tort claims, like those raised by Plaintiff, District of Columbia law employs a government interest test such that the law of the state with the greater interest in the controversy will apply. *Herbert v. District of Columbia,* 808 A.2d 776, 779 (D.C.2002). In determining which state has the greater interest, a court considers 1) "the place where the injury occurred;" 2) "the place where the conduct causing the injury occurred;" 3) the place where the relationship between the parties is centered, and 4) "the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.*   Since the conduct alleged in this case is centered around a contract with the Federal Highway Administration whose offices are in the

District of Columbia, the relationship between TSC and PPAS is centered in the District and TSC maintains an office in the District, it is hard to imagine a state with greater interest in this controversy than the District of Columbia. *See also, Government Relations Inc. v. Howe*, 2007 WL 201264, *8 (D.D.C.2007).

## VII.    ARGUMENT

### A.    Service of Process is Defective as to Both Defendants

Absent waiver, service on both individuals and corporations must comply with the provisions of federal Rule of Civil Procedure 4.  For the reasons set forth below, service of the Summons and Complaint did not comply with Rule 4 and is therefore defective. As such, the Complaint must be dismissed.

#### 1.    Service on Roy is Invalid

Federal Rule 4 states in pertinent part:

**(e) Service Upon Individuals Within a Judicial District of the United States.**

Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed, other than an infant or an incompetent person, may be effected in any judicial district of the United States:

**(1)** pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State; or

**(2)** by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.
Federal Rules of Civil Procedure Rule 4

Roy was served with the Complaint at the conclusion of PPAS' deposition in the Superior Court action while she was physically present in the District of Columbia. DX 9. Even though the general rule is that personal service within a district where the non-resident defendant is physically present, satisfies the requirements of Rule 4, *Burnham v. Superior Court of California,* 495 U.S. 604, 612-613 (1990), if a person is only in the district by force or fraud, *Id., and see Wanzer v. Bright,* 52 Ill. 35 (1869), or as a party or witness in other litigation, *Id., see also Buffkin v. Alum-Co Nat., Inc.,* 331 F.2d 96, 98 (D.C. Cir. 1963), the service was defective.

Because Roy was only present in the District of Columbia to testify on behalf of PPAS in the Superior Court Action, she was immune from service of process and the purported service was defective. *See Greene v. Weatherington,* 301 F.2d 565 (1962*) ("*non-resident witnesses, suitors, and their attorneys, while in attendance in connection with the conduct of one suit are immune from service of process in another …") (internal citations omitted); *and see* DX 1 at 38-39. As such the Complaint must be dismissed.

2.    **Service on PPAS is Invalid**

Federal Rule 4 states in pertinent part:

**(h) Service Upon Corporations and Associations.**

Unless otherwise provided by federal law, service upon a domestic or foreign corporation or upon a partnership or other unincorporated association that is subject to suit under a common name, and from which a waiver of service has not been obtained and filed, shall be effected:

**(1)** in a judicial district of the United States in the manner prescribed for individuals by subdivision (e)(1), or by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by

15

statute to receive service and the statute so requires, by also mailing a copy to the defendant, or

**(2)** in a place not within any judicial district of the United States in any manner prescribed for individuals by subdivision (f) except personal delivery as provided in paragraph                    (2)(C)(i)                    thereof. Federal Rules of Civil Procedure Rule 4

Service upon PPAS suffers from the same infirmary as the service on Roy.  PPAS was purportedly personally served process through its President, Ms. Roy at the conclusion of its deposition in the Superior Court Action.  DX 10; and see DX 1 at 38-39. For the reasons stated above, that service was improper as PPAS was immune from service of process at that time.

Moreover service on PPAS is invalid for another reason.  While such "tag" jurisdiction-personal service on an individual within the state-remains a valid method of acquiring personal jurisdiction over an individual, it is invalid over a corporation through the persons of its officers. *See Burnham, supra; and see Estate of Ungar v. Palestinian Authority,* 400 F.Supp.2d 541, 543 (S.D.N.Y.2005).  As such, the service over PPAS is invalid and the Complaint must be dismissed as to PPAS.

**B.**     <u>Roy is not Subject to Personal Jurisdiction in the District of Columbia</u>

Plaintiff's Complaint does not attempt to even make a cursory showing of personal jurisdiction over Ms. Roy, let alone the prima facie showing as required by the Court.  It fails to allege one single fact, separate from that of PPAS that would cause Ms. Roy to be subject to the jurisdiction of this Court.  In fact, the Complaint does not even mention the D.C. Long Arm statute, leaving this Court and the Defendant to guess as to which section Plaintiff claims applies.  As is more fully set forth below, this Court lacks personal jurisdiction over Ms. Roy, no provision of the D.C. Long Arm statute is

applicable in this case and due process considerations precludes the exercise of jurisdiction in this case.

### 1.    This Court Lacks Specific Jurisdiction Over Roy Because Roy's Only Contacts With This District are as Agent for PPAS

To determine whether the court may exercise specific personal jurisdiction over a defendant, a court must first examine whether jurisdiction is available under the applicable long arm statute, and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process. *Brunson v. Kalil & Co.,* 404 F.Supp.2d 221, 226 (D.D.C. 2005). The District of Columbia long arm statute provides in pertinent part:

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's --
>
> (1) transacting any business in the District of Columbia;
>
> (2) contracting to supply services in the District of Columbia;
>
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;
>
> (5) having an interest in, using, or possessing real property in the District of Columbia;
>
> (6) contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed within the District of Columbia at the time of contracting, unless the parties otherwise provide in writing…
> D.C. Code § 13-423(a) (2007)

Because a court in the District may exercise jurisdiction over a non-resident defendant "only [for] a claim of relief arising from the specific acts enumerated in [the statute]… *id.* § 13-423(b), plaintiff's jurisdictional allegations must arise from the same conduct of which the plaintiff complains. *See, e.g., Willis v. Willis*, 655 F.2d 1333, 1336 (D.C. Cir. 1981). In other words, specific personal jurisdiction allows only those claims "based on acts of a defendant that touch and concern the forum," *Brunson*, 404 F.Supp.2d at 226.

Moreover, the plaintiff is charged with the burden of establishing the requisite links to the forum as to each defendant individually. *First Chicago Int'l v. United Exchange Co.,* 836 F.2d 1375, 1378 (D.C. Cir. 1988); *Biton v. Palestinian Interim Self-Government Authority,* 310 F.Supp.2d. 172, 176 (D.D.C. 2004). A court does not have jurisdiction over individual officers and employees of a corporation just because the court has jurisdiction over the corporation. *See Keeton v. Hustler Magazine,* 465 U.S. 770, 780 n. 13, (1984); *Wiggins v. Equifax, Inc.,* 853 F.Supp. 500, 503 (D.D.C. 1994). As the court in *Overseas Partners, Inc. v. Progen*, 15 F.Supp.2d 47, 51 (D.D.C. 1998) explained:

> Personal jurisdiction over officers of a corporation in their individual capacities must be based on their personal contacts with the forum, not their acts and contacts carried out solely in a corporate capacity.
>
> *Id.*

Plaintiff's Complaint is devoid of any alleged contacts on the part of Roy that is based upon her personal contacts with the forum. In fact, the only conduct alleged in the Complaint found in paragraph VII, does not allege what specific acts were performed by each Defendant, to whom the acts were directed, where the alleged conduct took place or even that Roy performed any acts or has any contacts with the District that are not

corporate. *Wiggins*, 853 F.Supp. at 503; *see also Schwartz v. CDI Japan, Ltd*., 938 F.Supp. 1, 6 n. 8 (D.D.C. 1996).

Moreover, Plaintiff failed to even allege that the D.C. long arm statute controls, leaving us to conjecture which provision it believes applies to Ms. Roy.  In any event, Defendant is sure that no provision of the long arm statute applies to her.  As she attests:

1.    I am a U.S. citizen and resident of the State of Maryland.  I currently work as the Chief Operating Officer of Progressive Partners Achieving Solutions, Inc., ("PPAS").

2.    I am one of the Defendants named in the Complaint filed in this cause by Tom Sawyer Productions, Inc. ("Plaintiff or TSC").

3.    I am not a citizen or resident of the District of Columbia, nor do I work or in the District of Columbia.

4.    My Co-Defendant and employer, PPAS, is a duly incorporated entity in the State of Maryland and maintains an office in Maryland.   Neither PPAS nor myself, maintains a business address in the District of Columbia.

5.    PPAS is a business development firm specializing in marketing and strategic business planning.

6.    I do not own, use, possess, or have any interest in any real property located within the District of Columbia.

7.    I do not personally transact any business within the District of Columbia.  All my business dealing within the District of Columbia are done in my capacity as President and CEO of PPAS or on behalf of PPAS.

8.    I do not personally contract to supply services or things in the District of Columbia.  Any contract to supply services or things within the District of Columbia are done in my capacity as President and CEO  and or representative of PPAS or on behalf of PPAS. All contracted services are rendered by PPAS are provided in the PPAS Company Name.

9.          I do not regularly personally do or solicit business, or engage in any persistent course of conduct, or derive any substantial revenue from goods used or consumed or services rendered in the District of Columbia.

10.          I do not now, nor have I ever contracted to insure any person, property or risk located within the District of Columbia.

11.          I have never incurred a tangible personal property tax liability within the District of Columbia or in any political subdivision thereof.
DX 1 at 1-11.

In short, the Complaint has failed to allege any acts by Roy in the District of Columbia which would give rise to jurisdiction under § 13-423 .  Accordingly, personal jurisdiction may not be exercised over Roy pursuant to the long arm statute.

**2.     This Court Lacks General Jurisdiction Over Roy Because Roy Is a Non-Resident Defendant Who Does Not Do Business in the District of Columbia**

The general personal jurisdiction statute of the District confers no jurisdiction upon District of Columbia's courts over Roy.  That statute provides that

[a] District of Columbia court may exercise personal jurisdiction over [an entity] domiciled in, organized under the laws of, or maintaining [] its principal place of business in, the District of Columbia as to any claim for relief.
D.C. Code § 13-422 (2007).

Roy (a) is not domiciled in the District of Columbia (Compl. at III), (b) is not licensed or qualified to do business within the District of Columbia (*id*. II, III; DX 1 at 4, 5), (c) is not organized under the laws of the District of Columbia (*id*.), and (d) does not have its principal place of business in the District of Columbia. (*id*.). Accordingly, § 13-422 does not confer jurisdiction here over Roy, a non-resident defendant.  *E.g.*, *Capital*

*Bank Int'l, Ltd. v. Citigroup, Inc.*, 276 F.Supp.2d 72, 75 (2003) ("[f]or general jurisdiction under [§ ]13-422, the plaintiff must demonstrate that the defendant is 'domiciled in, organized under the laws of, or maintains ... its principal place of business in, the District,'" quoting from § 13-422); *EBM Group Corp. v. Gulfstream Aerospace Corp.*, 145 F.R.D. 8, 9 (D.D.C. 1992) (§ 13-422 applies only to persons domiciled in the District of Columbia); *Pollack v. Meese*, 737 F.Supp. 663 (D.D.C. 1990) (§ 13-422 addresses personal jurisdiction over residents or those incorporated in the District of Columbia).

The court may also exercise general jurisdiction under D.C. Code § 13-334 (2007). For jurisdiction to attach under that section, TSC must show that Roy "carries on a consistent pattern of regular business activity within the jurisdiction." *Trerotola v. Cotter,* 601 A.2d 60, 63 (D.C. 1991) (citing D.C. Code § 13-334). For a court to have general jurisdiction pursuant to § 13-334, Roy must have a continuing business presence in the District that is directed at advancing Roy's objectives. *El-Fadl v. Cent. Bank of Jordan,* 75 F.3d 668, 675 (D.C. Cir. 1996); *see also Helicopteros Nacionales*, 466 U.S. at 415 (doing business for purposes of general jurisdiction means "systemic and continuous" contacts with the jurisdiction). TSC has not alleged that Roy, in her individual capacity, has any contacts with the District, much less that she "carries on a consistent pattern of regular business activity" here. D.C. Code § 13-334 (2007). Nor could it in good faith do so, given that Roy, in her individual capacity, does not have any "systemic and continuous" contacts with the District. *See* DX 1 at 1-11.

3.    **In Any Event, This Court Cannot Exercise Personal Jurisdiction Over Roy Consistent With Due Process**

To satisfy due process requirements of the Fifth Amendment to the Constitution, an exercise of personal jurisdiction over a non-resident corporation must meet minimum contacts requirements described by the Supreme Court:

> In order for a court to exercise personal jurisdiction over a non-resident, the prospective defendant must have contacts with the jurisdiction sufficient to satisfy "'traditional notions of fair play and substantial justice.'" *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945) (quoting *Milliken Meyer*, 311 U.S. 457, 463, 85 L. Ed. 278, 61 S. Ct. 339 (1941)). Without such minimum contacts, intentionally established, due process is violated when a defendant is required to respond to process in a foreign state. *See Burger King Corp.*
>     *Rudzewicz*, 471 U.S. 462, 474, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)[ ("*Burger King*"); *Hanson v. Denckla*, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958). The contacts must be such that the defendant reasonably could have anticipated being sued in the forum state in an action arising out of those contacts. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980).

*De Jesus Baltierra v. W. Va. Bd. of Med.*, 253 F.Supp.2d 9, 13 (D.D.C. 2003); *see also*, *e.g.*, *Comsat Corporation v. Finshipyards*, 900 F.Supp. 515, 520 (D.D.C 1995) ("*Comsat*") ("the constitutional touchstone of the due process determination is 'whether the defendant purposefully established minimum contacts in the forum state,'" quoting *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 108-09 (1987)).

Thus, the inquiry here must be whether Roy did some act or acts by which she purposely availed herself of the privilege of conducting activities within the District of Columbia, thereby invoking the benefit and protection of its laws.  *E.g.*, *Comsat*, 900 F.Supp. at 522; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 85 L.Ed.2d 528,

543, 105 S.Ct. 2174, 283-84 (1985) ("jurisdiction is proper ... where the contacts

proximately result from actions by defendant *himself* that create a 'substantial

connection' with the forum state," quoting *McGee v. International Life Insurance Co.,*

355 U.S. 220, 223, 2 L.Ed.2d. 223, 226, 78 S.Ct. 199, 201 (1957) ("*McGee*") (emphasis

in original)).

　　　　In this case, Roy does not maintain an office in the District of Columbia. (DX 1 at

5.)  Roy has never had any sort of continuing presence in the District of Columbia.  (*Id*. at

1-11)  Furthermore, Roy has never engaged in any continuous or systematic contacts with

the District of Columbia. (*Id.*)  Accordingly, Roy has not had "minimum contacts" with

the District of Columbia, she has not herself "created a 'substantial connection' with" the

District of Columbia (*McGee*, 355 U.S. at 223), and she has not availed herself,

purposely or otherwise, of the privilege of conducting her business activities within the

District of Columbia so as to obtain the benefits of its laws.  Thus, in any event, personal

jurisdiction cannot be constitutionally exercised over Roy.

　　　C.　　**Plaintiff's Claim for Tortious Interference With Contractual**
　　　　　　**Relations Fails To State a Claim**

　　　　In order to survive a motion to dismiss on a claim of intentional interference with

contractual relations, Plaintiff must sufficiently plead 1) the existence of a contract; 2)

knowledge of the contract; 3) intentional procurement of a breach of the contract; and 4)

damages resulting from the breach.  *CASCO Marina Dev., L.L.C. v. District of Columbia*

*Redevelopment Land Agency,* 834 A.2d 77, 83 (D.C.2003) (quoting *Paul v. Howard*

*Univ.,* 754 A.2d 297, 309 (D.C.2000) (footnote and citation omitted)).*See also PM*

*Services Co. v. ODOI Assoc.,* 2006 WL 20382 at *34 (D.D.C.2006); *Furash & Co. v.*

*McClave,* 130 F.Supp.2d 48, 55-56 (D.D.C.2001); *Mercer Mgmt. Consulting v. Wilde,*

920 F.Supp. 219, 239 (D.D.C.1996)[3].  Moreover, the defendant's interference must be

improper.  *Furash & Co. v. McClave*, 130 F.Supp.2d 48, 56 (D.D.C. 2001).

Even an extremely deferential reading of Plaintiff's Complaint reveals that

Plaintiff has failed to plead an "intentional procurement of a breach of contract"

sufficient to state a claim of tortuous interference[4].

### 1.    The Conduct Alleged Cannot Constitute Intentional Interference of a Contract

Plaintiff's allegations that either Defendant intentionally procured a breach

or cancellation of the contract are too vague to withstand a motion to dismiss.

Intentionally procuring a breach of a contract requires "[m]otive or purpose to disrupt

ongoing business relationships ... and a strong showing of intent is required to establish

liability."  *Rickards v. Caine Eye Reg. Found.,* 704 F.2d 1449, 1456 (9th Cir. 1983). A

general intent to interfere or knowledge that conduct will injure the plaintiff's business

dealings is insufficient to impose liability. *Id.* Intentional procurement of a breach must

involve egregious conduct such as "libel, slander, physical coercion, fraud,

misrepresentation, or disparagement." *See Shepard v. Dickstein, Shapiro, Morin &*

*Oshinsky,* 59 F.Supp.2d 27, 34 (D.D.C.1999) (quoting *Genetic Sys.,* 691 F.Supp. at 423).

Plaintiff has failed to plead any facts, absent bare allegations and conclusions, regarding

the Defendants' conduct.  *See* Compl. at VII (alleging "Defendants pursued a course of

conduct consisting of unauthorized and inappropriate communications with the FHWA

---

[3]   While *PM Services, Furash,* and *Mercer* pertain to intentional interference with a prospective business advantage or business relationship, "[t]he tort of intentional interference with a prospective business advantage runs 'parallel to that for interference with existing contracts.' " *Brown v. Carr,* 503 A.2d 1241, 1247 (D.C.1986) (quoting W. Prosser, Law of Torts § 130, at 952 (4th ed.1971) (footnote omitted); citing *DeKine v. Dist. of Columbia,* 422 A.2d 981, 988 (D.C.1980)).

[4]  Defendants do not dispute that a contract with the FHWA existed or that they had knowledge of the contract.

contracting officers, which was intended to disrupt Plaintiff's relationship with the third

party, and which in fact did disrupt that relationship"), let alone any conduct that would

rise to the level of "libel, slander, physical coercion, fraud, misrepresentation or

disparagement." *Id.*

      At most, the unspecified conduct alleged in the Complaint is that one or both of

the Defendants made unauthorized (without explaining why they were unauthorized) and

inappropriate  communications (without identifying even one inappropriate

communication).  These bare allegations and conclusory statements alone, without

allegations of intent to interfere by the Defendants, cannot support Plaintiff's claim and it

must be dismissed.  *See Genetic Systems Corp. v. Abbot Laboratories*, 691 F.Supp. 407,

423 (D.D.C. 1988) (dismissing tortuous interference claim for failure to plead intent to

interfere).

      **2.**      **This Constitutes a Parallel Proceeding Under *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) And The Court Should Decline to Hear it**

      Parallel litigation of factually related cases in separate fora is inefficient.  *Handy*

*v. Shaw, Bransford, Veilleux & Roth,*  325 F.3d 346, 349 (D.C. Cir. 2003).  "Indeed,

separate parallel proceedings have long been recognized as a judicial inconvenience.

*Columbia Plaza Corp. v. Sec. Nat'l Bank,* 525 F.2d 620, 626 (D.C.Cir.1975) ("Sound

judicial administration counsels against separate proceedings, and the wasteful

expenditure of energy and money incidental to separate litigation of identical issues

should be avoided.") (footnotes omitted). For 'reasons of wise judicial administration,'

*Colo. River,* 424 U.S. at 818, the district court is given discretion to dismiss or stay a

pending suit in favor of a consolidated action in another forum…So long as the parallel

cases involve the same subject matter, the district court should-for judicial economy-resolve both suits in a single forum*." Id.*

In holding that the parallel litigation rules applies to cases first brought in D.C. Superior Court, the *Handy* court explained:

> *Colorado river* recognizes as a countervailing interest "wise judicial administration," *Colo. River,* 424 U.S. at 817, 96 S.Ct. at 1246 (internal quotations omitted), an interest as relevant as between the district court and the Superior Court as it is between the district court and a state court. Moreover, when the issues raised in the parallel proceedings are ones of local law, Superior Court judges presumably have as much expertise as would a state court judge in deciding questions of state law. This is one reason that we defer to the local courts' interpretations of the D.C. Code in the same manner that other federal courts defer to state court interpretations of state law. *See United States v. Edmond,* 924 F.2d 261, 264 (D.C.Cir.), *cert. denied,* 502 U.S. 838, 112 S.Ct. 125, 116 L.Ed.2d 92 (1991). The Congress's treatment of D.C. courts as state courts for certain purposes, also counsels in favor of our making the same analogy.

*Id.* at 352.

A District Court may exercise its discretion in declining to exercise its jurisdiction in a particular matter for the purpose of judicial economy only after weighing certain factors. *Colo. River,* 424 U.S. at 817-18; *Moses H. Cone v. Mercury Const. Corp.,* 460 U.S. 1, 25-26 (1983); *Reiman v. Smith,* 12 F.3d 222, 223 (D.C. Cir. 1993). Those factors include: (1) whether either court has assumed jurisdiction over a *res*; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction, (5) whether federal law or state law controls; and (6) whether the state forum will adequately protect the interests of the parties. *Burns v. Watler,* 931 F.2d 140, 146 (1st Cir.1991).

Taking each factor in turn, factors one and two are neutral as both the D.C.

Superior Court and this Court have jurisdiction over the subject matter in this case.  Also, it cannot be said that the Superior Court or the District Court is an inconvenient forum when compared to each other.  Therefore, factors one and two do not tip the scales one way or another in determining whether this Court should decline to exercise its jurisdiction.

The remaining four factors weigh heavily in favor of this Court declining to exercise jurisdiction in this case.  As discussed above, it is a cornerstone of our judicial system for courts to be mindful of wasting precious judicial resources.  It was indeed recognized in *Colo. River* that

> there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.

At. 817.

Factor number 3 therefore weighs in favor of dismissal[5].

Factor 4 also weighs against the exercise of jurisdiction.  There is no doubt that the Superior Court had jurisdiction first, as it was filed seven months ahead of the case *sub judice*.  In fact, substantial proceedings have already taken place in the Superior Court action.  Discovery has nearly been completed and all parties have been deposed. "[P]riority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions"…the fact that

---

[5] According to U.S. Courts Judicial Caseload Profile for this Court found at http://www.uscourts.gov/cgi-bin/cmsd2006.pl, in 2006, there were 4114 cases pending and it took a case an average of 37 months to get from filing to trial.

"[i]t was the [federal]-court suit in which no substantial proceedings ... had taken place" weighed [in favor of dismissal] of federal action). *Moses H. Cone,* 460 U.S. at 21-22.

Factors 5 and 6 also weigh in favor of dismissal. Since this diversity case is based solely on issues of common law tort and on no issue of Federal statute construction or Federal common law, District of Columbia and not Federal law will apply. As discussed above, when issues of local law apply, Federal judges will defer to local court interpretations of the state's own laws. *Colo. River, supra.* Similarly, there is no reason to believe that the D.C. Superior Court will not adequately protect the rights of the litigants. In fact, to force these parties to basically start from scratch[6] and duplicate time, money and efforts would be one way to exploit the rights of the parties. As such, dismissal is appropriate.

### D.    Defendant's Are Entitled to Judgment As A Matter of Law

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett,* 477 U.S. 317, 322 (1986). As discussed in section C, *supra,* the elements of a claim for intentional interference for contractual relations are as follows: 1) the existence of a contract; 2) knowledge of the contract; 3) intentional procurement of a breach of the contract; and 4) damages resulting from the breach. *CASCO Marina Dev., L.L.C. v. District of Columbia Redevelopment Land Agency,* 834 A.2d 77, 83 (D.C.2003).

---

[6]  The Court should appreciate that discovery would be extremely duplicative as we would be deposing the same people, on the same facts and producing the same documents.

Because Plaintiffs cannot prove any facts to show that Defendants intentionally procured the breach of the contract, an essential element of its claim, the claim must be dismissed as a matter of law.

The undisputed material facts show that Ms. Roy had some concerns with how the contract was being managed which were discussed among all the teaming partners.  DX 7 at 53.  On July 21, 2006, Ms. Roy sent an email to TSC and copied the reminder of the contracting team at FHWA, along with PMG.  *See* DX 1, Exh. 3.  The e-mail attempted to clarify a request by the FHWA to develop additional justification/proposal for regional conferences.  *Id.*  Ms. Roy was concerned that only a portion of her previous response to the request by TSC was communicated to the Government.  *Id.*  The e-mail went on to state that:

> I am more than willing to fulfill all requirements in support of the client's request …I sincerely apologize for any confusion or discrepancies the e-mail information forwarded by Ms. Sawyer may have caused since it was an excerpt from the complete note.  **I look forward to being a team member and a partner to support the program goals of FHWA.**

*Id.*; *see also,* Roy Depo at 57-58, lines 10-22; 1-15, emphasis added.

It was never suggested that Ms. Roy or any of the team members did not have the authority to communicate with the contracting team.  In fact, it was not uncommon for all the members of the team to meet, including PMG and PPAS and the client informed the team members that they wanted "open communications."  Roy Depo at 58-59, Lines 16-22; 1-14, Brown Depo at 54-55, Lines 22; 1-7; 61-62, Lines 10-22; 1-11.  This conduct of Ms. Roy wholeheartedly fails to establish even a scintilla of evidence that she improperly interfered with the FHWA contract with the intent to cause its breach.  Intentionally procuring a breach of a contract requires "[m]otive or purpose to disrupt ongoing

business relationships ... and a strong showing of intent is required to establish liability."

*Rickards,* 704 F.2d at 1456.   Intentional procurement of a breach must involve egregious

conduct such as " libel, slander, physical coercion, fraud, misrepresentation, or

disparagement." *See Shepard* ,59 F.Supp.2d at 34 (internal citations omitted).   Plaintiff

knows it cannot allege, must less prove, any such facts.   Plaintiff knows this now and it

certainly knew this at the time the suit was filed.

Furthermore, the Associate Administrator of the Office of Civil Rights at the

FHWA, Frederick Isler, was the manager of the FHWA contract.  Isler Dec. at 3, attached

hereto as DX 8.  As he attests:

3)  In my capacity as Associate Administrator of the Office of Civil Rights, I was the manager of the FHWA Contract referred in the Complaint (the "Contract").  I am familiar with the facts and circumstances surrounding the decision to terminate that Contract.

4)  As the Associate Administrator of the Office of Civil Rights and the manager of the Contract, I was the sole decision maker with regard to the determination of the need for the Contract, the final approval of the Contract and any decisions to terminate the Contract.  No one else has the authority to make those decisions.

5)  I terminated the Contract on September 6, 2006.

6)  My decision to terminate the Contract on that day was not influenced in any way by the actions or inactions of either Progressive Partners Achieving Solutions, Inc. ("PPAS") or Renata Roy ("Roy").  As a matter of fact, my decision to terminate the FHWA contract had absolutely nothing to do with either PPAS or Roy at all.

DX 8.

This testimony certainly and without doubt, puts to rest any question as to PPAS' or

Roy's involvement in the termination of the FHWA contract.  Because as Mr. Isler states,

the decision to terminate the contract had nothing to do with the actions of these

Defendants, Plaintiff cannot prove that they were damaged as a result of the conduct of

the Defendants in this case.

As such, Plaintiff cannot prove another essential element to their cause of action and it must be dismissed as a matter of law.

## VIII.  <u>CONCLUSION</u>

On the basis of the foregoing the instant motion should be granted.


Respectfully submitted,

Rolinski & Suarez, L.L.C.


<u>   /s/Danielle M. Espinet</u>
Danielle M. Espinet, Bar # 478553
14915 River Rd.
Potomac, MD 20854
Ph: (240)632-0903
Fax: (240)632-0906
Email: despinet@rolinski.com

Counsel for the Defendants

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **TOM SAWYER PRODUCTIONS, INC.** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **PROGRESSIVE PARTNERS** | ) |
| **ACHIEVING SOLUTIONS, INC., <u>et. al.</u>** | ) |

_____ )

**Case No.:1:07CV01304
Judge: Rosemary M. Collyer**

### <u>ORDER</u>

Upon consideration of Defendants' Motion to Dismiss Pursuant To Federal Rules
Of Civil Procedure 12(b)(5), 12(b)(2), and 12(b)(6), Or, In The Alternative For Summary
Judgment, Plaintiff's opposition thereto, it is this _____ day of _____, 2007,

ORDERED that Defendants' Motion to Dismiss Pursuant To Federal Rules Of
Civil Procedure 12(b)(5), 12(b)(2), and 12(b)(6), Or, In The Alternative For Summary
Judgment shall be, and hereby is GRANTED; and it is

FURTHER ORDERED that Plaintiff's Complaint is hereby dismissed, with
prejudice.

SO ORDERED.

_____
Honorable Rosemary M. Collyer,
United States District Court Judge

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TOM SAWYER PRODUCTIONS, INC. )
      Plaintiff, )
         )
   v. )      Case No.:1:07CV01304
         )      Judge: Rosemary M. Collyer
PROGRESSIVE PARTNERS )
ACHIEVING SOLUTIONS, INC., et. al. )
         )

## DECLARATION OF RENATA ROY

Being first duly sworn, the undersigned deposes and says:

1.      My name is Renata Roy. I am more than twenty-one years of age, and I am competent to make this declaration. I have personal knowledge of all the facts set forth herein.

2.      I am a U.S. citizen and resident of the State of Maryland. I currently work as the Chief Operating Officer of Progressive Partners Achieving Solutions, Inc., ("PPAS").

3.      I am one of the Defendants named in the Complaint filed in this cause by Tom Sawyer Productions, Inc. ("Plaintiff or TSC").

4.      I am not a citizen or resident of the District of Columbia, nor do I work or in the District of Columbia.

5.      My Co-Defendant and employer, PPAS, is a duly incorporated entity in the State of Maryland and maintains an office in Maryland. Neither PPAS nor myself, maintains a business address in the District of Columbia.

6.      PPAS is a business development firm specializing in marketing and strategic business planning.

7.      I do not own, use, possess, or have any interest in any real property located within the District of Columbia.

8.      I do not personally transact any business within the District of Columbia. All my business dealing within the District of Columbia are done in my capacity as President and CEO of PPAS or on behalf of PPAS.

9.      I do not personally contract to supply services or things in the District of Columbia. Any contract to supply services or things within the District of Columbia are done in my capacity as President and CEO and or

representative of PPAS or on behalf of PPAS. All contracted services are rendered by PPAS are provided in the PPAS Company Name.

10.    I do not regularly personally do or solicit business, or engage in any persistent course of conduct, or derive any substantial revenue from goods used or consumed or services rendered in the District of Columbia.

11.    I do not now, nor have I ever contracted to insure any person, property or risk located within the District of Columbia.

12.    I have never incurred a tangible personal property tax liability within the District of Columbia or in any political subdivision thereof.

13.    In or around 2005, PPAS, along with another company Portfolio Management Group, Ltd., ("PMG") began marketing the Federal Highway Administration (hereinafter "FHWA") to acquire an 8(a), Small Business Administration (hereinafter "SBA") contract for providing services connected with a National Civil Rights Summit to be held by FHWA, Office of Civil Rights.

14.    During a marketing meeting at FHWA in or around July or August of 2005, a representative of FHWA suggested to PMG and PPAS that they contact Carolyn Sawyer, (hereinafter "Sawyer") the President of TSC in order to work with TSC on the FHWA project for a specific component.

15.    Shortly thereafter I contacted Sawyer, via telephone, and scheduled a face to face introduction meeting.

16.    On August or about 17, 2006, A conference call was held with representatives of TSC and PMG, on behalf of PPAS, to discuss the possibility of teaming on the FHWA project.

17.    On August 31, 2005, PMG, PPAS and TSC, (collectively, "the teaming partners") through their respective representatives, entered into a Teaming Agreement (hereinafter "the Agreement") with PMG as the prime contractor to pursue the FHWA contract.. A true and correct copy of the agreement is attached hereto as Exhibit 1, and is adopted and incorporated herein by reference as if specifically set forth herein.

18.    On November 2, 2005, PMG, PPAS and TSC, through their respective representatives, signed an addendum to the Agreement. The Addendum made TSC the prime contractor because PMG graduated from the 8(a) program and was no longer eligible to receive 8(a) SBA contracts. A true and correct copy of the addendum to the agreement is attached hereto as Exhibit 2, and is adopted and incorporated herein by reference as if specifically set forth herein.

19.    Pursuant to clause 1 of the agreement, as prime contractor, TSC assumed overall responsibility for the preparation and submission of the proposals for the project.

20.    In addition, pursuant to TSC's responsibilities under the SBA contract TSC was solely responsible for collecting invoices for payment, revenues and making distributions of revenues to the other two teaming partners.

21.    Pursuant to clause 6 of the agreement, each teaming partner was to have the opportunity to achieve one third of the tasks and the associated yearly gross revenues, less a one percent administrative fee for the prime contractor.

22.    During September 2005, the teaming partners continued their marketing efforts at the FHWA. PMG and PPAS developed a proposed contract budget, and hoped that they would receive the contract award by the end of the fiscal year.

23.    In or around January 1, 2006, the teaming partners received the Request for Proposal (hereinafter "RFP") from FHWA.

24.    In or around February 16, 2006, the teaming partners met with the FHWA contracting officer and contracting officer's technical representative and presented as a team and presented their combined compatibility statement, reviewed the statement of work and submitted a list of questions developed as a team.

25.    On March 2, 2006, the teaming partners met again to review the final proposal to be submitted to FHWA. PMG was responsible for the technical portion of the proposal; TSC was responsible for cost portion of the proposal and PPAS was responsible for preparing the payment schedule.

26.    All three teaming partners put significant time and effort into the proposal and all three teaming partners reviewed and agreed upon the contents of the final submission to FHWA.

27.    The final proposal was delivered to FHWA by all the teaming partners in or around March 2, 2006.

28.    On April 4, 2006, the teaming partners attended and participated in cost negotiation with FHWA.

29.    On April 27, 2006, FHWA awarded the contract to the teaming partners. The contract was numbered FH61-06-C-00016.

30.    On August 1, 2006, PPAS, through its counsel, wrote to TSC and PMG requesting an independent audit and financial accounting to review any money collected, any money spent, and all outstanding invoices. This request was ignored by TSC. A second request, PPAS, through its counsel again wrote to TSC and PMG requesting a financial accounting of all monies

collected, monies spent, and all outstanding invoices in connection with the now terminated FHWA contract. That request was also ignored by TSC.

31.    On September 6, 2006, FHWA terminated the contract citing as its reason "convenience."

32.    On October 24, 2006, TSC sent a letter to PMG and PPAS. The letter represented that the remaining balance in the FHWA account was being distributed one third to each of the teaming partners as final distribution of contract revenues.

33.    On or about November 22, 2006, PPAS, through its counsel, wrote to TSC asking for, *inter alia*, a complete and full financial accounting of all monies collected, spent and received, including all back up documentation including, but not limited to, bank statements, invoices, check stubs, wire transfer receipts, correspondence and disbursements associated in any way with the contract and a basis and justification for the calculations as set forth in the October 24, 2006, letter from TSC.

34.    On November 29, 2006, TSC responded in writing that "management was reviewing the request and would be in touch."

35.    To date, neither PPAS nor PMG has received a response.

36.    On January 4, 2007, PPAS along with PMG filed a complaint in D.C. Superior Court against TSC, alleging breach of contract and breach of fiduciary duty.

37.    On or around March 5, 2007, TSC filed its Answer but failed to include any counterclaims in the pleading.

38.    On July 23, 2007, I was present within the District of Columbia pursuant to a Notice of Deposition in the Superior Court Action testifying on behalf of PPAS. I was not voluntarily within the District of Columbia on July 23, 2007, nor did I conduct any business, personal, social or other.

39.    At the conclusion of that deposition, without notice, I was served with two summons and complaints in this case. One summons was directed at PPAS and the other was directed at me personally.

40.    Contrary to the allegations in the Complaint, neither PPAS nor I pursued any course of conduct intending to disrupt the FHWA contract. In fact, as explained above, PPAS was benefiting from the contract and had a financial expectation of one-third of contract revenues.

41.    PPAS previously had been contracted by US DOT headquarters, for similar services and has a successful track record for delivery of services. Being that this is the same facility that houses the FHWA leadership team, PPAS'

4

business reputation has been negatively impacted due to the cancellation of the FHWA contract.

42. Neither PPAS nor I made any unauthorized communications with the FHWA contracting officers. In fact all members of the team were encouraged to openly communicate with the contract team at FHWA, by those members themselves.

43. Furthermore, all the teaming partners did in fact openly communicate with the FHWA program and contracting officers, had meetings with them and were authorized to do so by the program manager that was responsible for the contract management and services being rendered.

44. On July 21, 2006, I sent an e-mail to the entire contracting team, including the contracting officers at the FHWA. A true and correct copy of that e-mail is attached hereto as Exhibit 3.

45. I understand that this declaration may be submitted to the Court in connection with and in support of motions filed on my behalf. I consent to the use of this declaration in connection with this case.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK**

I declare under penalty of perjury that the foregoing is true and accurate to the best of my personal knowledge.

Renata Roy    9/28/07

Dated: September 27, 2007

# TEAMING AGREEMENT

This AGREEMENT, effective as of the 31st day of August 2005 between Portfolio Management Group, Ltd., a Washington, DC Corporation (hereinafter referred to as "PMG) having an office at 1612 K Street, NW, Suite 1104, Washington, DC 20006 and (hereinafter referred to as PMG and Progressive Partners Achieving Solutions, Inc. (PPAS), (hereinafter refered to as PPAS ) and The Tom Sawyer Company (hereinafter refered to as TSC). This Agreement concerns the establishment of a working relationship between PPAS, TSC and PMG to develop a management and technical approach for the OJT/DBE Summit 20006 proposal(s) for The Federal Highway Administration, Office of Civil Rights, AASHTO and the Minnesota Department of Transportation (Hereinafter referred to as "Client") and then, to work together to complete each winning project. The proposal(s) and resulting projects shall be know as: OJT/DBE Summit.

WITNESSETH

WHEREAS, PPAS, TSC and PMG possess complementary technical capabilities and each desires to utilize certain of such capabilities of the other in a joint proposal and resulting project effort; and

WHEREAS, the activity which is the subject matter of this agreement may require the parties to exchange technical or competitively sensitive information that is proprietary to the originating party; and

WHEREAS, the parties desire to define and establish their respective rights, responsibilities, duties, obligations, and the working relationship in the joint proposal and resulting project effort consistent with federal and state laws governing restraint of trade or competition;

NOW, THEREFORE, in consideration of the promises and the mutual agreements contained herein, PPAS, TSC and  PMG do hereby mutually agree as follows:

1. As the proposed prime contractor, PMG with the approval and joint coordination of PPAS and TSC shall assume overall responsibility for the preparation and submission of the proposal(s) for the project (s) and for the work on any resulting project. PMG, PPAS and TSC shall be named as ContractTeaming Partners.  PMG, PPAS and TSC duties and prices will be described in each proposal. PPAS and TSC will help PMG write a cost and technical proposal for the project (s), satisfying requirements for the areas of work in which it is agreed that it possess complementary technical competence, The areas of work for which PMG, PPAS and TSC  will be responsible for are set forth in Exhibit A, entitled "Statement of Tasks and Responsibilities"

**EXHIBIT**

**1**

1

2. The final version of the proposal will be prepared at PMG's Washington facility. Both PPAS and TSC will prepare its components at their offices and shall supply the necessary liaison effort and other support to draft and write the agreed portion of the proposal (including any subsequent revisions thereto) within its specific areas of responsibility. Each party will bear its own costs, risks, and liabilities during the pre-proposal and proposal effort. PMG, PPAS and TSC will share the full cost of printing, binding, and delivering the proposal. PMG will notify PPAS & TSC of the associated costs and agree upon said costs in advance. PPAS and TSC will provide PMG with a reasonable opportunity to review the components prepared by PPAS and TSC.

3. PMG will provide PPAS and TSC with a reasonable opportunity to review the entire proposal (s) and recommend changes prior to submittal to the client. Subsequent to said review there shall be no changes in those portions of the proposal(s) describing PMG, PPAS and TSC's responsibilities unless they are reviewed and approved by PMG, PPAS and TSC. PMG shall maintain a log of such changes should they occur. At the time of submittal to the client, PMG shall furnish PPAS and TSC one (1) copy of the Proposals (s).

4. PMG will keep PPAS and TSC informed concerning all significant aspects of proposal preparation, timing, and status of prime contract negotiations. Assuming award of the proposal, PPAS and TSC will support and participate in prime contact negotiations relative to its efforts as Teaming Partners.

5. Exhibit A summarizes the tasks PPAS and TSC will work on and the dollars PPAS and TSC will receive. However, the actual scope and price of OJT/DBE Summit Tasks as described in the proposal (s) may vary from this percentage in which case the actual scope will supersede Exhibit A.

6. The scope and price for PMG, PPAS and TSC's effort for the project (s) will be agreed upon by PMG, PPAS and TSC and this agreement will be reflected in the proposal(s) submitted. These documents, as submitted to the client will become an integral part of this agreement. Each Teaming Partner shall have the opportunity to achieve 1/3 of the tasks and the associated yearly gross revenues, including change authorizations less a 1% administrative fee for the Prime Contractor.

7. Once the proposal (s) has been submitted to the client, any price reduction on a proposal will be split between PMG, PPAS and TSC in proportion to their original respective dollar shares in that proposal unless the reduction pertains to an identifiable portion of the work.

8. It is understood and agreed that if a contract is awarded to PMG or PPAS or TSC the other teaming parties shall enter into a subcontract subject to the requirements of the prime contract with the client, applicable laws and

2

regulations, agreement on other terms and conditions, and, if required by the prime contract, approval of the client. The subcontract will be subject to the requirements of the prime contract including any adjustment in work activities or contract terms negotiated with the client. The Prime Contractor will advise the other two Teaming Partners, prior to accepting the contract and the commencement of work, of all clauses or provisions of the prime contract the team member is subject to and of any changes or exceptions to the proposal approved by the client.

9.  PMG, PPAS and TSC agree to continue the teaming relationship on work which may result from this initial contract and commencing within one year of the end of the initial project work if the client agrees to the continuation of this teaming relationship and mutual work experience results in an effective and cooperative relationship.

10. In the event PMG, PPAS or TSC is successful in securing additional related project work from the client, PMG, PPAS and TSC agree to engage the other Teaming Partners in approximately the same proportion to the total project as exists during the initial project, assuming this mix is appropriate for the scope of the future work.

11. During the term of this agreement, the parties shall act as to avoid any conflict of interest or the appearance of a conflict of interest between them and while this agreement is in effect shall not solicit the existing, contracted business of the other with respect to the proposal or any subsequent contract related thereto. However, this agreement shall not be construed to preclude competition between the parties with respect to procurements, which are not directly related to the present subject matter of the proposal. Likewise, nothing in this agreement shall preclude either team member from offering its products or services to any other party in the event that the contract, which is the subject of this proposal, is awarded to a third party. However, neither party shall make any offer, solicitation, stand-by agreement, or the like to be effective on the duration of the contract to a third party.

12. During and for a period of 6 Months following the terms of this agreement the parties shall not solicit and/ or employ the personnel of the other.

13. During the term of this agreement, the parties may desire to and exchange or disclose to one another's information and data, which is considered to be proprietary or competitively sensitive (hereinafter collectively referred to as " Proprietary Data") . For purposes of this agreement, all information related in any way to the proposal or proposal strategies whether written or oral is, without the necessity of specific designation, considered proprietary information unless expressly excluded. Information previously disclosed under the presently existing

3

confidential disclosure agreement details is also considered to be protected under this agreement.

Proprietary technical information shall be subject to the protections of this agreement provided it is identified as such in the following fashion.

a) Written disclosures including information in electronic media, shall contain a prominent proprietary legend.

b) Oral disclosures shall be contemporaneously orally identified as proprietary.

c) Any proprietary technical information, written or oral, not designated contemporaneously may be protected by a subsequent notification of its proprietary nature; however, such protection commences from the date of notification.

All parties agree that each will not disclose such proprietary data to third parties without the written consent of the transmitting party, provided however, that the recipient party shall not be liable for any disclosure of such proprietary data under the following conditions.

a) if the data is within, or later falls within, the public domain through no fault of the recipient;

b) if the data is already lawfully known by the recipient, its divisions subsidiaries, or parent, and such knowledge is substantiated by documentation dated prior to the disclosure thereof the transmitting party;

c) if the data is legally obtainable without restriction from another source;

d) if the data has been or later is disclosed by the transmitting party to others on a no restricted basis; or

e) if the data is approved for release or us by express written authorization of an authorized representative of the transmitting party.

Each party agrees that all proprietary data received in accordance with this agreement will be disclosed only to personnel of the recipient party having a "need to know" in connection with performance necessary to carry out the proposal or performance of any resultant contract between the parties. Proprietary data may be reproduced to the extent required to permit performance of this agreement, provided that each copy, regardless of media,

4

will carry a proprietary notice and otherwise be subject to all of the provisions of this agreement.

Except as provided herein, information jointly developed for the purpose of the project shall be the joint property of the parties; and neither party, without the consent of the other, shall disclose or publicize such information or data without the written consent of the other party, for a period of 1 year from the date of development of the information.

Neither this agreement nor any disclosure of information hereunder shall be construed to grant either party any rights, license, or immunity, directly, by implication, estoppels or otherwise, in proprietary data of the other party, except as expressly recited herein.

Nothing to this agreement shall be construed as a warranty or representation of any kind with respect to the content or accuracy of documents and information transmitted or exchanged by the parties under this agreement.

14. Except as may be expressly provided otherwise in this agreement, shall remain in effect until any contract is awarded. If no contract is awarded, this agreement will end up upon such notification by the client. However, the non-disclosure provision shall survive expiration.

15. Neither party may assign or transfer any interest in this agreement without the prior written consent of the other parties. Any attempted assignment without such consent shall be void.

16. In recognition of the considerable amount of proprietary data expected exchanged by the parties, neither party shall, during the term of this agreement, participate, formally or informally, with another party for the purpose of preparing or submitting a competing proposal addressing the subject matter of this agreement.

17. This Agreement shall not constitute, create, or give effect to or otherwise imply a joint venture, partnership, or any form of formal business association of any kind. Each party of this agreement shall act as an independent contractor, Neither party to this agreement shall have any authority or control over the other nor shall either party have the power to bind the other party, except to the extent specifically provided and set forth herein. Nothing contained in this agreement shall be construed as providing for the sharing of profits or losses arising from the efforts or either or bother the parties hereto, and each party shall bear all costs, fees, charges, expenses and the like incurred by it.

18. In no event shall either party be responsible or liable for any indirect, special, punitive, incidental or consequential damages, including lost profits, of the other party or any third party.

19. Invoicing and Payment

Invoices shall clearly reference a unique invoice number on each invoice, and the date of the invoice. Invoice shall include the "Amount Previously Billed," the "Amount of the Invoice," and the "Total Amount Billed to Date." Invoices shall be prepared in duplicate and contain the following information: subcontract number, item number, description of services, items, quantities, unit prices and extended totals. PMG will pay the Teaming Partners upon receipt of payment from the Client. The Payment terms are net 5 days after receipt of payment from the Client and a proper invoice and acceptance of delivered items or services. The Prime Contractor in concurrence with the Teaming Partners may make adjustments to the Teaming Partners' Invoice due to shortages, late delivery, rejections or other failure to comply with the requirements of the subcontract before payment.

20. This Agreement shall be construed and interpreted and the rights of the parties hereto shall be determined in accordance with the laws of the District of Columbia. In the event that any part of this agreement is unenforceable, the validity of the remaining portions or provision hereof shall not be affected.

21. This agreement including Exhibit A hereto are the entire Agreement between parties regarding its subject matter and supersedes all prior or concurrent negotiations, representations, or agreements with respect thereto.

22. All notices pursuant to this agreement shall be in writing sent by certified mail, return receipt requested, and be addressed as follows:

Portfolio Management Group, Ltd.
1612 K Street, NW
Suite 1104
Washington, D.C. 20006
Attention: Ms. Monica A. Brown

THIS AGREEMENT has been duly signed and accepted by the parties as of the 31 day of August, 2005.

Portfolio Management Group, Ltd.          Progressive Partners Achieving Solutions, Inc.

Signature:                                Signature

6

Name: Monica A. Brown

Name: Renata "Toni" Roy

Title: President

Date: 8/31/05

Title: COO

Date: 8/31/05

Tom Sawyer Company, Inc.

Signature:

Name: Carolyn Sawyer

Title: President

Date: 8/31/05

7

**Amendment # 1**

Teaming Agreement
for
OJT/DBE Summit

September 2, 2005

Amendment to the Teaming Agreement signed and dated August 31, 2005, between Portfolio Management Group, Ltd. (PMG), Progressive Partners Achieving Solutions, Inc. (PPAS), and Tom Sawyer Company (TSC) to develop a management and technical approach for OJT/DBE Summit 2006.

Purpose: To amend the above stated teaming agreement by changing the proposed prime contractor, from Portfolio Management Group Ltd., (PMG) to The Tom Sawyer Company (TSC), and therefore amend article(s) 2, 3, 4, 22 and other relevant articles accordingly.

All other terms of the Teaming Agreement remain unchanged.

**THIS AMENDMENT** has been duly signed and accepted by the parties as of the ____2nd____ day of September 2005.

Tom Sawyer Company, Inc.                          Portfolio Management Group Ltd.

Signature: _____               Signature: _____

Name: Carolyn Sawyer                              Name: Monika A. Brown

Title: President                                  Title: President

Date: __9/6/05__                                  Date: __9/2/05__

Progressive Partners Achieving Solutions, Inc.

Signature: _____

Name: Renata "Toni" Roy

Title: COO

Date: __9/6/05__

EXHIBIT
2

September 2, 2005                                                                 1

**Simanco Staley**

EXHIBIT

3

| | |
|---|---|
| **From:** | renataroy@aol.com |
| **Sent:** | Friday, July 21, 2006 11:49 AM |
| **To:** | renataroy@aol.com; Tomsawyercompany@aol.com; simanco@tomsawyercompany.com |
| **Cc:** | portmgmt@starpower.net; Pamela.Foster@dot.gov; teresa.banks@dot.gov; Frederick.Ford@dot.gov; Vickie.Anderson@dot.gov; Brenda.Armstead@fhwa.dot.gov |
| **Subject:** | Re: Client Request CLARIFICATION - justifications for National Summit |

**Mr Isler and Team , I received an email note this morning from Ms Sawyer, that was sent to the entire team. It only contained a portion of the message that I sent to her for clarification of the request to develop additional justification /proposal for regional conferences. Only one sentence from my email was forwarded to the team. It did not convey my full response to her request. I am forwarding you the original email which is below for your review.** It is important that the use of hours are applied appropriately against the specified contract. I did not want to use the hours that are contracted to the Summit to meet the needs of other task without the permission of the Client. I am more than willing to fulfill all requirements in support of the Client's request if the Prime Contractor informs all team members fully that it is a "Client request". As a small business, it is also important to have an understanding of contract hours and protecti! on of in tellectual property.

Mr Isler and Brenda, if this is a Client's request, it was was not fully communicated or translated to the team as such. I will move forward if this is your request. Based on the time frame for planning a quality National Summit, we may need to consider other options instead of regional conferences.

**I sincerely apologize for any confusion or discrepancies the email information forwarded by Ms Sawyer may have caused since it was an excerpt from the complete note. I look forward to being a team member and a partner to support the program goals of FHWA.**

Best Regards,

Renata "Toni" Roy
Partners Achieving Solutions
Founder/COO

-----Original Message-----
From: renataroy@aol.com
To: Tomsawyercompany@aol.com; simanco@tomsawyercompany.com
Cc: portmgmt@starpower.net
Sent: Thu, 20 Jul 2006 4:46 PM
Subject: Re: justifications for National Summit

Has the client requested this - is there a task order for this request- how are we billing these hours that are not related to this contract? whose account do we charge this against ?

Are you asking for us / me to build a justification for 3 regional conferences FOR PROGRAM CONTENT to lead up to a national SUMMIT? pls confirm? You ARE ASKING FOR MY LANGUAGE TO DEVELOP REGIONAL CONFERENCES? - WHERE IS THE CUSTOMER'S REQUEST for a program change or addition? - THIS is PROPRIETARY INFORMATION - I DO NOT SHARE / build PROPOSALS FOR FREE - IT MUST BE A CLIENT REQUEST IN WRTING RELATIVE TO THIS

# EXHIBIT 2

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

PORTFOLIO MANAGEMENT GROUP, LTD
A Washington D.C. Corporation
1612 K St., NW, Suite 1104
Washington, D.C. 20006

                 **0000034-07**

-and-

PROGRESSIVE PARTNERS ACHIEVING SOLUTIONS, INC.
A Maryland Corporation
12302 Longwater Drive
Mitchellville, Maryland  20721      :

              PLAINTIFFS,

      v.

TOM SAWYER PRODUCTIONS, INC
d/b/a TOM SAWYER COMPANY
1050 17th St., NW, Suite 1000
Washington, D.C. 20036

Serve:
CAROLYN SAWYER, President
1050 17th St., NW, Suite 1000
Washington, D.C. 20036

            DEFENDANT.

------------------------------------------------------------------------------:

COMPLAINT
(Breach of Contract; Breach of Fiduciary Duty; Accounting)

COME NOW plaintiffs, by and through undersigned counsel, and, pursuant to SCR-

Civ. 7 and SCR-Civ. 8, for a cause of action state and aver as follows:

JURISDICTION

1.      Jurisdiction is founded on 11 DC Code § 921.

## PARTIES

2.    Plaintiff, Portfolio Management Group, Ltd., (hereinafter, "PMG" or "Plaintiff") is a corporation with its principal place of business in the District of Columbia and which regularly does, engages in and transacts business in the District of Columbia, including business out of which these claims arise.

3.    Plaintiff, Progressive Partners Achieving Solutions, Inc, (hereinafter, "PPAS" or "Plaintiff," and collectively with PMG, "Plaintiffs") is a corporation with its principle place of business in Prince Georges County, Maryland, and which regularly does, engages in and transacts business in the District of Columbia and Maryland, including business out of which these claims arise.

4.    Defendant, Tom Sawyer Productions, Inc., d/b/a Tom Sawyer Company, (hereinafter "TSC" or "Defendant") is a corporation with its principle place of business in South Carolina and an office in the District of Columbia and which regularly does, engages in and transacts business in the District of Columbia, including business out of which these claims arise.

## FACTS COMMON TO ALL COUNTS

5.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through four of the Complaint.

6.    PMG is a management consulting firm specializing in providing conference and meeting planning, training and support services.

7.    PPAS is a business and program development firm specializing in marketing and strategic business planning for capacity building and partnerships.

8.    Based on past United States Department of Transportation (herein after "USDOT") conference/summit planning services history and performance, in July 2005, PPAS was made aware of a contract opportunity for the National Civil Rights Summit to be held in 2007 by the Federal Highway Administration, (herinafter "FHWA"), Office of Civil Rights. PPAS engaged PMG as a potential partner to pursue the opportunity.

9.    In or around August 2005, PMG and PPAS began marketing FHWA to acquire a contract for providing services connected with a National Civil Rights Summit to be held in 2007 by FHWA, Office of Civil Rights.

10.    During an initial introduction and marketing meeting at FHWA in or around July or August of 2005, a representative of FHWA suggested PPAS contact Carolyn Sawyer, (hereinafter "Sawyer") the President of TSC in order to work with TSC on the FHWA project. It was suggested during this meeting that the preferred procurement vehicle to accomplish the project was use of the Small Business Administration (hereinafter "SBA") 8(a) program.

11.    Shortly thereafter, Renata "Toni" Roy, (hereinafter "Roy") the president and chief operating officer of PPAS contacted Sawyer, via telephone, and scheduled a meeting.

12.    On August 17, 2005, Sawyer, Roy and Monica Brown (hereinafter "Brown"), the President of PMG met at the Wyndham hotel in Washington, D.C., to discuss the possibility of their respective companies teaming on the FHWA project.13.    On August 31, 2005, PMG, PPAS and TSC, (collectively, "the teaming partners") through their respective representatives, entered into a Teaming Agreement (hereinafter "the Agreement") with PMG as the prime contractor to pursue the FHWA contract. A true and correct copy of the

agreement is attached hereto as Exhibit 1, and is adopted and incorporated herein by reference as if specifically set forth herein.

14.     A subsequent meeting was held at FHWA with PPAS, the project leader and contracting specialist that confirmed the procurement vehicle would be the SBA 8(a) program and the partners should validate the status of their 8(a) certifications.

15.     On September 2, 2005, PMG, PPAS and TSC, through their respective representatives, signed an addendum to the Agreement, (hereinafter "The Addendum"). The Addendum made TSC the prime contractor because PMG graduated from the 8(a) program and was no longer eligible to receive 8(a) SBA contracts.  A true and correct copy of the addendum to the agreement is attached hereto as Exhibit 2, and is adopted and incorporated herein by reference as if specifically set forth herein.

16.     Pursuant to clause one (1) of the Agreement, as prime contractor, TSC assumed overall responsibility for the preparation and submission of the proposals for the project.

17.     In addition, pursuant to TSC's responsibilities under the SBA contract TSC was solely responsible for collecting invoices for payment, revenues and making distributions of revenues to the other two teaming partners.

18.     Pursuant to clause two (2) of the Agreement, each teaming partner was to bear its own costs, risks, and liabilities during the pre-proposal and proposal effort.

19.     Pursuant to clause six (6) of the Agreement, each teaming partner was to have the opportunity to achieve one third of the tasks and the associated yearly gross revenues, less a one percent administrative fee for the prime contractor.

20.     During September 2005, the teaming partners continued their marketing efforts at FHWA.  PMG and PPAS developed a proposed event budget as a guideline, and hoped that they would receive the contract award by the end of the fiscal year.

21.    In December 2005, PPAS and PMG attended the United States Department of Transportation Disadvantaged Business Enterprise (herein after "USDOT DBE") national conference, in Baltimore where many FHWA key people attended to continue their marketing efforts of pursing the contract.

22.    In or around January 1, 2006, the teaming partners received the Request for Proposal (hereinafter "RFP") from FHWA.

23.    In or around January 27, 2006, PMG and TSC interviewed potential project managers for the project in anticipation of contract award in the very near future.

24.    In or around February 16, 2006, a meeting was scheduled by FHWA procurement for the teaming partners to provide a briefing on their vision for executing services for the proposed contract. PPAS and PMG prepared the contents for the briefing and the final handout document. All three partners met with the FHWA contracting officer and contracting officer's technical representative and presented the briefing document, their combined compatibility statement, reviewed the statement of work and submitted a list of questions.

25.    On March 2, 2006, the teaming partners met again to review the final proposal to be submitted to FHWA. PMG, through Brown, was responsible for the technical portion of the proposal; TSC, through Sawyer, was responsible for the cost portion of the proposal and PPAS, through Roy, was responsible for research, developing and preparing a bi weekly payment schedule that would be accepted by FHWA procurement officials.

26.    All three teaming partners put significant time and effort into the proposal and all three teaming partners reviewed and agreed upon the content of the final submission to FHWA.

27.    The final proposal was delivered to FHWA by the teaming partners in or around March 2, 2006.

28.    On April 4, 2006, the teaming partners attended and participated in cost negotiation with FHWA.29.    On April 27, 2006, FHWA awarded the contract to TSC and named the teaming partners.  The contract was numbered FH61-06-C-00016.

30.    During the months of May, June and July partners' meetings were held at the Tom Sawyer Washington location. At this time the state of the business and the financials of the contract were discussed and reviewed. The request was made by PPAS and PMG for full banking information and consideration for joint decision making on award of the project supplier contracts and the payment for services to manage contract cost and profit outcomes.  These requests were ignored.

31.    On August 1, 2006, PPAS, through its counsel, wrote to TSC and PMG requesting an independent audit and financial accounting to review any money collected, any money spent, and all outstanding invoices.  Subsequently a follow up letter was sent to TSC pursuing the same request.  Both requests were ignored by TSC.

32.    On September 6, 2006, FHWA terminated the contract citing as its reason "convenience."

33.    On September 14, 2006, PPAS, through its counsel again wrote to TSC and PMG requesting a financial accounting of all monies collected, monies spent, and all outstanding invoices in connection with the now terminated FHWA contract.  That request was also ignored by TSC.

34.    On October 24, 2006, TSC, through its FHWA project manager Simanco Staley (hereinafter "Staley") sent a letter to PMG and PPAS .  The letter represented that the remaining balance in the FHWA account was being distributed one third to each of the

teaming partners as final distribution of contract revenues. Total Project accounting records with disbursements for all activity that occurred during the contract period was not included in the documentation for validation of the contracted for final one third distribution

35.     On or about November 22, 2006, PMG and PPAS, through their counsel, wrote to TSC asking for, *inter alia*, a complete and full financial accounting of all monies collected, spent and received, including all back up documentation including, but not limited to, bank statements, invoices, check stubs, wire transfer receipts, correspondence and disbursements associated in any way with the contract and a basis and justification for the calculations as set forth in the October 24, 2006, of the FHWA Project Manager.

36.     On November 29, 2006, Staley responded in writing that "management was reviewing the request and would be in touch."

37.     No response has been received.


## COUNT ONE
### (Breach of Contract)

38.     Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through thirty seven of the Complaint.

39.     Plaintiffs and TSC for good and valuable consideration entered into the Agreement.

40.     Pursuant to the terms of the Agreement, all FHWA contract revenues and services were to be distributed one third to each teaming partner.

41.     Pursuant to the terms of the Agreement, all teaming partners were to bear their own expenses and costs for the pre-proposal and proposal efforts.

42.     Despite repeated demand and notice, TSC has failed to comply with the express terms of the Agreement and has failed to meet its implied covenant of good faith and fair dealing.

43.    Plaintiffs fully performed their obligations under the Agreement.

44.    TSC's breach was material.

45.    As a direct, proximate and foreseeable consequence of the breach of the Agreement by TSC, Plaintiffs have sustained loss of the funds due to them, loss of the benefit of their bargain, TSC was unjustly enriched and Plaintiffs suffered other nominal, incidental and consequential damages as a result of the breach.

## COUNT TWO
### (Breach of Fiduciary Duty)

46.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through forty five of the Complaint.

47.    TSC was the agent of the Plaintiffs in collecting and distributed monies pursuant to the FHWA contract. TSC explicitly assumed exclusive dominion and control over the FHWA contract funds, as well as the information related to the receipt and the accounting for those funds.

48.    TSC owed a fiduciary duty to Plaintiffs.

49.    TSC breached their fiduciary duties to plaintiffs by its failure to act in good faith, by engaging in self-dealing, by failing to exercise due care and by failing to act with diligence.

50.    As a direct, proximate and foreseeable cause of the breach of fiduciary duty by TSC, Plaintiffs have sustained the loss of the funds/profits due them, the loss of the benefit of their bargain and sustained other damage and loss.

## COUNT THREE
### (Accounting)

51.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs one through fifty of the Complaint.

52.    At all times prior to the commencement of this action, Defendant has maintained control of the monies collected, the monies spent, and all information related thereto, pursuant to the FHWA contract.

53.    On no less than three occasions, counsel for the Plaintiffs has demanded that Defendant provide a full financial accounting to review the monies collected, received and invoiced pursuant to the FHWA contract.

54.    Defendant has refused to comply with these requests.

55.    As such, Plaintiffs request that Defendant be required to produce an independent accounting of all monies received, all monies distributed, payroll, and all invoices submitted to client pursuant to the FHWA contract from the date of contract award to the present.

WHEREFORE, by all these presents, counsel for Plaintiffs pray, subject to the right to amend this Complaint to assert additional claims or add additional parties, for the following relief:

1.    A judgment against Defendant and in favor of Plaintiffs in an amount to be proven at trial, but in any event no less than $250,000, exclusive of interests and costs;

2.    As to count two, punitive damages in an amount to be proven at trial;

3.    An award of prejudgment interest;

4.    As to count two, an award of attorneys' fees;

5.    As to count three, a full financial accounting and review of the FHWA contract; and

6.    Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,

Danielle M. Espinet Bar #478553
ROLINSKI & SUAREZ, L.L.C.
14915 River Road
Potomac, MD 20854
(240) 632-0903
Counsel for the Plaintiffs

# EXHIBIT 3

1

```
 1        SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

 2                     Civil Division

 3

 4    - - - - - - - - - - - - - - - x      COPY

 5    PORTFOLIO MANAGEMENT GROUP,      :

 6    LTD, et al.,                     :

 7            Plaintiffs,              : Civil Action

 8        vs.                          : No. 2007 CA 000034B

 9    TOM SAWYER PRODUCTIONS, INC.,    :

10            Defendant.               :

11    - - - - - - - - - - - - - - - x

12

13             Deposition of RENATA ROY

14                  Washington, D.C.

15                Monday, July 23, 2007

16                    1:10 p.m.

17

18

19

20    Job No.:  2-107674

21    Pages:  1 - 89

22    Reported by:  Sarah M. Bickel
```



**L.A.D.**
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF RENATA ROY
CONDUCTED ON MONDAY, JULY 23, 2007

53

1       Q   So you had some concerns about how the

2   business was being managed?

3       A   The services for the client.   The services

4   we had to deliver.

5       Q   You had some concerns about the services

6   that were being delivered to the client?

7       A   Yes.

8       Q   And did you make those concerns known to

9   your teaming -- to the other teaming partners?

10      A   We all discussed it.

11      Q   Did you make those concerns known to the

12  Federal Highway Administration?

13      A   No, the Federal Highways made it known to

14  Tom Sawyer because they felt it, they lived it.

15      Q   How do you -- how do you know that they

16  felt it and lived it?

17      A   Well, I'll give you a good example.   When

18  we were in North Carolina looking at the site, the

19  location of the site, I think Simanco, Carolyn --

20  Simanco, Monica and I, we were already there prior to

21  Carolyn arriving.   When she arrived at the hotel -- I

22  think it was right during lunch, when we arrived at

DEPOSITION OF RENATA ROY
CONDUCTED ON MONDAY, JULY 23, 2007

57

1      A   No.

2           MS. ESPINET:   Where's Fred Isler?

3           THE WITNESS:   He's not even on here

4      because I had the wrong person.   He didn't even get

5      it.

6           MS. ESPINET:   He's not on there.

7           THE WITNESS:   Mr. Isler didn't ever get

8      this so it really went on the other team members.

9           BY MR. LOVE:

10          Q   What was the circumstances surrounding

11     your sending that e-mail?

12          A   We were getting from -- I think some of

13     the team members -- we were constantly being asked by

14     Ms. Sawyer to do new justifications all the time, you

15     know, constantly.   We were on a firm-fixed contract,

16     meaning that the number of hours that are in that

17     contract, no matter which way you use them, when

18     they're gone, they're gone.   So constantly when

19     you're doing -- Tom Sawyer was always asking us to do

20     new justifications because I think they were asking

21     her to do other things all the time or asking

22     her -- I don't know what was going on, but she would

DEPOSITION OF RENATA ROY
CONDUCTED ON MONDAY, JULY 23, 2007

58

1   come back to Portfolio Management and us -- or myself

2   and always have us doing more justifications, more

3   proposals, you know, for price increases.

4           So my concern was if this is what the

5   client wanted -- I mean, because we were on a

6   firm-fixed contract, so I tried to get clarifications

7   we couldn't get from Ms. Sawyer.  Why were we

8   constantly doing additional proposals which were

9   eating into man hours, these were really hours I

10  couldn't bill for because there was no line item in

11  the contract to do updated proposals and updated

12  justifications and those kind of changes.  So that

13  meant we were taking that on, those hours, and it was

14  expensive hours, you had to take that cost on

15  yourself.

16      Q   What authority did you have to contact

17  these persons directly about something that occurred

18  within the teaming relationship?

19      A   It was not inside the teaming

20  relationship, sir, but we were working as a team and

21  the agreement was -- let me share this with you.  The

22  agreement when we had a meeting -- June 22nd at

DEPOSITION OF RENATA ROY
CONDUCTED ON MONDAY, JULY 23, 2007

59

1    Department of Transportation, we broke up into three

2    teams, and each one of us were assigned to a team

3    person inside the FHWA.  It wasn't supposed to go

4    through Tom Sawyer.  Each person, based on the

5    competency or the project or whatever we were working

6    on, we were split into three teams so we could be

7    effective.

8          The client also said to us, "We want open

9    communications," that's what the client told us.  The

10   client said, "We want to work with everybody.  You

11   guys are a team.  We want to work with everybody,"

12   and that's the authority I was given.  The client

13   said, "Work with all of us.  We want open

14   communications," and that was my authority.

15         Q  But you were well aware that Tom Sawyer

16   Productions was the prime contractor on this --

17         A  But the clients --

18         Q  It's a yes or no answer.  You're aware

19   that Tom Sawyer Productions was the prime contractor

20   in this engagement?

21         A  Sure, she was the prime contractor.

22         Q  And you are aware that Tom Sawyer

# EXHIBIT 4

 **TOM SAWYER COMPANY**

AD
PR
STRATEGISTS

October 24, 2006

Ms. Monica A. Brown
President
Portfolio Management Group, Ltd.
1612 K Street, NW Suite 1104
Washington, DC 20006

RE:    Terminated Contract No. DTFH61-06-C-00008 titled "CIVIL RIGHTS TRANSPORTATION SUMMIT-2007"

Ladies:

The Tom Sawyer Company has received and reviewed all final invoices for Contract #DTFH61-06-C-00008. Final distributions including the agreed 1% administrative fee have been paid as of this writing. The remaining balance in the FHWA account is fifteen-thousand eight hundred ninety-eight dollars and eighty-one cents ($15,898.81). The remaining balance has been divided equally between the three firms for a final pay-out of five thousand two hundred ninety-nine dollars and sixty cents ($5,299.60). Please see attached the Chief Financial Officer's balance sheet which covers the accounting period beginning May 20, 2006, to October 17, 2006.

In keeping with our process of full disclosure, please find attached bank statements supporting the account activity from August 8, 2006 to October 16, 2006. The copies provided also include final payments received by all firms since the contract termination date of September 6, 2006.

In conjunction with the previously provided monthly financials (see timeline below), this packet provides you with a complete and final accounting of TSC's contract administration to include: any monies received, any monies spent and final distribution of remaining funds in the account.

PO Box 12551, Columbia, SC 29211
p. 803.252.8773   f. 803.252.9780
www.tomsawyercompany.com



# TOM SAWYER COMPANY

**AD**
**PR**
STRATEGISTS

**Timeline for Previous Documentation Provided**
June - (Monday, June 19, 2006) – all partners present and received financial documentation
July – Wednesday, July 12, 2006 – packages sent via Fed ex (PMG received July 13, 2006 @
1:25 p.m.  PPAS received July 13, 2006 @ 1:14 p.m. – see attached email confirmations)
August – Wednesday, August 9, 2006 – packages sent via Fed Ex (PMG received August 10,
2006 @ 2:00 p.m.  PPAS received August 10, 2006 @ 12:54 p.m. – see attached email
confirmations)

As always we wish you all the best.

Sincerely,

Simanco Staley
FHWA Project Manager

Cc:    Carolyn Sawyer, President/CEO
       Thompson Sawyer, CFO
       South Carolina SBA Office

PO Box 12551, Columbia, SC 29211
p. 803.252.8773   f. 803.252.9760
www.tomsawyercompany.com



# TOM SAWYER COMPANY

AD
PR

STRATEGISTS

## BALANCE SHEET

### FHWA

| | Invoice Date | Payment Date | Invoice Amount |
|---|---|---|---|
| Invoice # 1 | May 15, 2006 | June 14, 2006 | $30,000.00 |
| Invoice # 2 | May 29, 2006 | July 10, 2006 | $30,000.00 |
| Invoice # 3 | June 12, 2006 | July 10, 2006 | $30,000.00 |
| Invoice # 4 | June 26, 2006 | July 13, 2006 | $30,000.00 |
| Invoice # 5 | July 10, 2006 | August 13, 2006 | $30,000.00 |
| Invoice # 6 | July 24, 2006 | August 13, 2006 | $30,000.00 |
| Invoice # 6 | August 7, 2006 | August 13, 2006 | $23.96 |
| Invoice # 7 | August 21, 2006 | September 12, 2006 | $30,000.00 |
| Invoice # 8 | September 4, 2006 | September 12, 2006 | $30,000.00 |
| Invoice # 9 | September 18, 2006 | October 5, 2006 | $30,000.00 |
| | | **Total** | **$270,023.96** |

### TSC

| | Invoice Date | Payment Date | Invoice Amount |
|---|---|---|---|
| Invoice # 1 | May 15, 2006 | June 14, 2006 | $6,239.40 |
| Adjustment Invoice # 1 | May 15, 2006 | June 26, 2006 | $300.00 |
| Invoice # 2 | June 15, 2006 | July 11, 2006 | $14,094.00 |
| Pre-Award | | July 12, 2006 | $9,868.00 |
| Invoice # 3 | July 15, 2006 | July 19, 2006 | $22,950.54 |
| Invoice # 4 | August 15, 2006 | August 17, 2006 | $22,887.73 |
| Adjustment Invoice # 2 | June 15, 2006 | September 7, 2006 | $220.27 |
| Revision Invoice # 3 | July 15, 2006 | September 7, 2006 | -$1,857.00 |
| Revision Invoice # 4 | August 15, 2006 | September 7, 2006 | -$3,431.25 |
| Invoice # 5 | September 15, 2006 | September 18, 2006 | $52,308.66 |
| Admin Fee Invoice | October 15, 2006 | October 16, 2006 | $2,700.00 |
| Final Teaming Disbursement | | October 24, 2006 | $5,299.60 |
| | | **Total** | **$131,579.95** |

PO Box 12551, Columbia, SC 29211
p. 803.252.8773  f. 803.252.9760
www.tomsawyercompany.com



# TOM SAWYER COMPANY

| PPAS | Invoice Date | Payment Date | Invoice Amount |
|---|---|---|---|
| Invoice # 1 | May 15, 2006 | May 30, 2006 | $2,041.00 |
| Invoice # 2 | June 15, 2006 | June 30, 2006 | $5,650.00 |
| Invoice # 3 | July 15, 2006 | July 24, 2006 | $8,500.00 |
| Invoice # 4 | August 15, 2006 | August 22, 2006 | $11,474.75 |
| Invoice # 5 | October 10, 2006 | October 17, 2006 | $27,425.60 |
| Final Teaming Agreement Disbursement | | October 24, 2006 | $5,299.60 |
| | | **Total** | **$60,390.95** |

| PMG | Invoice Date | Payment Date | Invoice Amount |
|---|---|---|---|
| Invoice # 1 | May 15, 2006 | May 30, 2006 | $2,041.00 |
| Invoice # 2 | June 15, 2006 | June 30, 2006 | $8,231.50 |
| Invoice # 3 | July 15, 2006 | July 24, 2006 | $6,950.00 |
| Invoice # 4 | August 15, 2006 | August 22, 2006 | $7,552.10 |
| Invoice # 5 | September 18, 2005 | September 19, 2005 | $21,728.85 |
| Final Teaming Agreement Disbursement | | October 24, 2006 | $5,299.60 |
| | | **Total** | **$51,803.05** |

| **Vendor-CVENT** | | July 18, 2006 | $26,250.00 |
|---|---|---|---|
| **BOA-FHWA** | | | **$0.00** |

1515 O St, NW #206, Washington, DC 20005-5514
p. 202.248.7483
PO Box 12551, Columbia, SC 29211
p. 803.252.8773   f. 803.252.9760
www.tomsawyercompany.com

# EXHIBIT 5

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

PORTFOLIO MANAGEMENT GROUP, LTD, ET AL       :

                          :

               Plaintiffs,           :

                          :

          v.                  : Civil Action 2007 CA 034B

                          :

TOM SAWYER PRODUCTIONS, INC.        :

                          :

              Defendant.          :

### ANSWER AND GROUNDS OF DEFENSE

COMES NOW the Defendant, Tom Sawyer Productions, Inc., by and through undersigned counsel, who hereby answers the Complaint filed by Plaintiffs as follows:

1. As to paragraph one of the Complaint, the Defendant admits that this Court has jurisdiction over the Plaintiff's claims.

2. As to paragraph two of the Complaint, the Defendant has insufficient information to admit or deny this allegation, and therefore denies same, and demands strict proof thereof.

3. As to paragraph three of the Complaint, the Defendant has insufficient information to admit or deny this allegation, and therefore denies same, and demands strict proof thereof.

4. As to paragraph four of the Complaint, the Defendant admits that it is a South Carolina corporation that is qualified to do business in the District of Columbia.

5. As to paragraph five of the Complaint, the Defendant incorporates their responses to paragraphs 1 through 4 of the Complaint.

1

6. As to paragraph six of the Complaint, the Defendant has insufficient information to admit or deny this allegation, and therefore denies same, and demands strict proof thereof.

7. As to paragraph seven of the Complaint, the Defendant has insufficient information to admit or deny this allegation, and therefore denies same, and demands strict proof thereof.

8. As to paragraph eight of the Complaint, the Defendant has insufficient information to admit or deny this allegation, and therefore denies same, and demands strict proof thereof.

9. As to paragraph nine of the Complaint, the Defendant has insufficient information to admit or deny this allegation, and therefore denies same, and demands strict proof thereof.

10. As to paragraph ten of the Complaint, the Defendant has insufficient information to admit or deny this allegation, and therefore denies same, and demands strict proof thereof.

11. As to paragraph eleven of the Complaint, the Defendant admits to this allegation.

12. As to paragraph twelve of the Complaint, the Defendant admits to this allegation.

13. As to paragraph thirteen of the Complaint, the Defendant admits that plaintiff PMG's legal counsel drafted the Teaming Agreement referred to as Exhibit 1.

14. As to paragraph fourteen of the Complaint, the Defendant admits this allegation.

15. As to paragraph fifteen of the Complaint, the Defendant admits to executing an Addendum to the Teaming Agreement on September 6, 2005, and admits that plaintiff PMG was not eligible to receive 8(a) contracts because their certification was no longer valid.

16. As to paragraph sixteen of the Complaint, the Defendant avers that the agreement speaks for itself.

17. As to paragraph seventeen of the Complaint, the Defendant avers that the agreement speaks for itself.

18. As to paragraph eighteen of the Complaint, the Defendant avers that the agreement speaks for itself.

19. As to paragraph nineteen of the Complaint, the Defendant avers that the agreement speaks for itself.

20. As to paragraph twenty of the Complaint, the Defendant admits that all parties collaborated to develop a budget.

21. As to paragraph twenty-one of the Complaint, the Defendant has insufficient information to admit or deny this allegation, and therefore denies same, and demands strict proof thereof.

22. As to paragraph twenty-two of the Complaint, the Defendant denies that the request for proposal was received on January 1, 2006.  The parties received the request for proposal on January 31, 2006.

23. As to paragraph twenty-three of the Complaint, the Defendant admits to this allegation.

3

24. As to paragraph twenty-four of the Complaint, the Defendant admits that the parties met on February 16, 2006 in preparation for the FHWA meeting, but denies the remainder of this allegation, and demands strict proof thereof.

25. As to paragraph twenty-five of the Complaint, the Defendant admits that the parties met on March 2, 2006, but denies the plaintiffs' characterization of the events thereof as being accurate, and demands strict proof thereof.

26. As to paragraph twenty-six of the Complaint, the Defendant admits that TSC put in significant time in preparing for submission of the proposal, but has insufficient information to admit or deny the remainder of this allegation, and therefore denies same, and demands strict proof thereof.

27. As to paragraph twenty-seven of the Complaint, the Defendant denies that the parties delivered the proposal.  TSC delivered the proposal while the plaintiffs waited in the car.

28. As to paragraph twenty-eight of the Complaint, the Defendant admits this allegation.

29. As to paragraph twenty-nine of the Complaint, the Defendant admits that the FHWA awarded the contract to the defendant TSC, but denies that the FHWA awarded the contract to the plaintiffs, who were named only as key personnel.

30. As to paragraph thirty of the Complaint, the Defendant admits that the parties discussed business and financial information, but denies that the defendant did not share information regarding the contract and the management thereof with the plaintiffs.

4

31. As to paragraph thirty-one of the Complaint, the Defendant admits that the plaintiffs submitted requests for financial information through their counsel, but denies that the defendant did not share the requested information with the plaintiffs.

32. As to paragraph thirty-two of the Complaint, the Defendant admits that the contract was terminated for convenience.

33. As to paragraph thirty-three of the Complaint, the Defendant admits that the plaintiffs submitted requests for financial information through their counsel, but denies that the defendant did not share the requested information with the plaintiffs.

34. As to paragraph thirty-four of the Complaint, the Defendant admits that the plaintiffs submitted financial information through the project manager, but denies that the defendant did not share the requested information with the plaintiffs.

35. As to paragraph thirty-five of the Complaint, the Defendant admits that the plaintiffs' counsel sent correspondence, to which the defendant had previously responded.

36. As to paragraph thirty-six of the Complaint, the Defendant admits the allegation contained therein.

37. As to paragraph thirty-seven of the Complaint, the Defendant denies this allegation, as the defendant responded to plaintiffs' requests on several prior occasions.

5

38. As to paragraph thirty-eight of the Complaint, the Defendant incorporates their responses to paragraphs 1 through 37 of the Complaint.

39. As to paragraph thirty-nine of the Complaint, the Defendant has insufficient information to admit or deny this allegation, and therefore denies same, and demands strict proof thereof.

40. As to paragraph forty of the Complaint, the Defendant answers that the agreement speaks for itself.

41. As to paragraph forty-one of the Complaint, the Defendant answers that the agreement speaks for itself.

42. As to paragraph forty-two of the Complaint, the Defendant denies this allegation and demands strict proof thereof.

43. As to paragraph forty-three of the Complaint, the Defendant has insufficient information to admit or deny this allegation, and therefore denies same, and demands strict proof thereof.

44. As to paragraph forty-four of the Complaint, the Defendant denies this allegation and demands strict proof thereof.

45. As to paragraph forty-five of the Complaint, the Defendant denies this allegation and demands strict proof thereof.

46. As to paragraph forty-six of the Complaint, the Defendant incorporates their responses to paragraphs 1 through 45 of the Complaint.

47. As to paragraph forty-seven of the Complaint, the Defendant admits to its role in the contract as provided for the Teaming Agreement referenced in Exhibit 1.

48. As to paragraph forty-eight of the Complaint, the Defendant owes a duty only as agreed to and provided for in the Teaming Agreement referenced in Exhibit 1.

49. As to paragraph forty-nine of the Complaint, the Defendant denies this allegation and demands strict proof thereof.

50. As to paragraph forty-two of the Complaint, the Defendant denies this allegation and demands strict proof thereof.

51. As to paragraph fifty-one of the Complaint, the Defendant incorporates their responses to paragraphs 1 through 50 of the Complaint.

52. As to paragraph fifty-two of the Complaint, the Defendant admits to its role in the contract as provided for the Teaming Agreement referenced in Exhibit 1.

53. As to paragraph fifty-three of the Complaint, the Defendant admits to its role in the contract as provided for the Teaming Agreement referenced in Exhibit 1.

54. As to paragraph fifty-four of the Complaint, the Defendant denies this allegation and demands strict proof thereof.

55. As to paragraph fifty-five of the Complaint, the Defendant denies this allegation as exceeding the terms of the Teaming Agreement referred to hereinbefore as Exhibit 1.

## FIRST AFFIRMATIVE DEFENSE

56. The Complaint fails to state a claim against the Defendants upon which relief may be granted.

7

## SECOND AFFIRMATIVE DEFENSE

57. The relief sought in the Complaint is or may be barred by the applicable statute of limitations.

## THIRD AFFIRMATIVE DEFENSE

58. The plaintiffs' are estopped from receiving the relief sought in the Complaint because they drafted the Teaming Agreement, whose terms are silent and/or ambiguous in requiring an accounting of monies received by the prime contractor.

WHEREFORE, Defendants respectfully move this Honorable Court to dismiss the Complaint, and all relief prayed for and assess costs against the plaintiffs, including an award of attorneys fees to defendant and for such relief as the Court deems appropriate.

TOM SAWYER PRODUCTIONS, INC.
By Counsel


BY:    _____
       Jonathan F. S. Love, P.C., DCB#424085
       GUYDON LOVE, LLP
       3309 Duke Street
       Alexandria, VA 22314
       Tel (703) 212-9000

8

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

PORTFOLIO MANAGEMENT GROUP, LTD, ET AL      :
                                            :
                        Plaintiffs,         :
                                            :
            v.                              : Civil Action 2007 CA 034B
                                            :
TOM SAWYER PRODUCTIONS, INC.                :
                                            :
                        Defendant.          :

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Answer and Grounds of Defense was served this 5TH day of March, 2006, via:

☐ Telecopy                    ☐ Overnight Mail
☐ Electronic Mail             ☐ Courier
☐ USPS First Class Mail       ☐ Other: _____
☐ USPS Certified Mail

upon the following counsel of record:

Danielle M. Espinet,Esq.
Tolinski & Suarez, LLC
14915 River Road
Potomac, Maryland 20854
Washington, DC  20037
240-632-0903

_____
Jonathan F. S. Love, P.C., DCB#
GUYDON LOVE, LLP
3309 Duke Street
Alexandria, VA 22314
Tel (703) 212-9000

# EXHIBIT 6

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| PORTFOLIO MANAGEMENT<br>GROUP, LTD and<br><br>PROGRESSIVE PARTNERS<br>ACHIEVING SOLUTIONS, INC.<br><br>     Plaintiffs,<br><br>     Vs.<br><br>TOM SAWYER PRODUCTIONS, INC.<br>d/b/a TOM SAWYER COMPANY<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     C.A. NO. 2007 CA000034B<br>)<br>)<br>)<br>)<br>)<br>) |

**AMENDED**
**NOTICE OF DEPOSITION OF DEFENDANT TOM SAWYER**
**PRODUCTIONS, INC.**

Portfolio Management Group, Ltd. and Progressive Partners Achieving Solutions,

Inc., by and through undersigned counsel, will take the deposition, pursuant to D.C. Sup. Ct.

Rule 30(b) (6), by oral examination of:

    Tom Sawyer Productions, Inc.
    C/o Mr. Jonathan Love
    The Love Law Firm
    3309 Duke Street
    Alexandria, VA 22314

through a person competent to testify under oath to the following issues:

    1) The allegations of the Complaint;

    2) Any facts supporting any defenses in the Answer;

    3) Any facts relating to the Contract and the teaming Agreement identified in the

Complaint;

    4) All documents pertaining to any receipts or disbursements under the Contract,

including any claims for any expenses reimbursed;

1

5) Any answer to any written discovery question or request;

6) The facts surrounding the termination of the Contract;

7) The corporate structure of the Defendant;

8) The SBA status of Defendant;

9) Any employee who provided services under the Contract;

10) The relationship between the plaintiffs and the defendant, including the commencement, tenure and termination of that relationship.

PLEASE TAKE FURTHER NOTICE that the deposition will take place before a Notary of the Public or other officer authorized by law on July 17, 2007, at 11:00 A.M., at the law offices of Musolino and Dessel, 1615 L Street, N.W., Suite 440, Washington, D.C. 20036. This deposition will be used for the purpose of evidence at the trial of the above matter, and will continue until completed.  Counsel is invited to attend and cross-examine.

Respectfully submitted,

Danielle M. Espinet, Esq. #478553
Rolinski & Suarez, LLC
14915 River Road
Potomac, Maryland  20854
240-632-0903
despinet@rolinski.com
Counsel for Plaintiffs

G:\Legal Docs\Civil\Portfolio v Tom Sawyer\Orders and Notices\07-07-12 Amendment Depo.doc

## CERTIFICATE OF SERVICE

 I HEREBY CERTIFY that a true and correct copy of the foregoing was e-mailed and mailed by first-class postage on this 12th day of July, 2007, to:

Mr. Jonathan Love
The Love Law Firm
3309 Duke Street
Alexandria, VA 22314
Counsel for Defendant

Danielle M. Espinet

3

# EXHIBIT 7

1

1   SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

2   Civil Division

3

4   - - - - - - - - - - - - - - - x   COPY

5   PORTFOLIO MANAGEMENT GROUP,      :

6   LTD, et al.,                     :

7          Plaintiffs,               : Civil Action

8      vs.                           : No. 2007 CA 000034B

9   TOM SAWYER PRODUCTIONS, INC.,    :

10          Defendant.               :

11  - - - - - - - - - - - - - - - x

12

13          Deposition of MONICA BROWN

14             Washington, D.C.

15           Monday, July 23, 2007

16                10:09 a.m.

17

18

19

20  Job No.:  2-107674

21  Pages:  1 - 85

22  Reported by:  Sarah M. Bickel


L.A.D
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

54

```
 1   one-third of the contract?

 2        A   Yes.

 3        Q   Now, do you know Mr. Isler?  Do you know

 4   him?  Fred Isler?

 5        A   We worked on a contract for him.

 6        Q   And did you know him prior to the award of

 7   this contract?

 8        A   No.

 9        Q   Do you know Mr. Van Nixon, or know of him?

10        A   I know of him, yes.

11        Q   Did you know of him before the award of

12   this contract?

13        A   No.

14        Q   How about Sarah Tarpgaard, did you know

15   her?

16        A   No.

17        Q   Prior to the award of this contract?

18        A   No, I did not.

19        Q   Have you spoken to Mr. Isler after the

20   contract's termination?

21        A   No, I have not.

22        Q   Have you spoken to Mr. Nixon after the
```

55

1    contract's termination?

2         A  No, just the final day on the phone.  No,

3    I have not spoken to him since then.

4         Q  And how about Sarah Tarpgaard, have you

5    communicated with her by e-mail or phone or anything

6    after the contract's termination?

7         A  I believe maybe by e-mail.

8         Q  Did you have any involvement with the

9    Charlotte 2007 Federal Highway Administration Summit?

10   It recently happened this past June in Charlotte.

11        A  What do you mean that I have any

12   involvement?

13        Q  I mean any involvement.

14        A  Well, as a part of the Federal

15   Highway -- as the TS -- as a part of the Federal

16   Highway contract, it was a site that I had gone out

17   and located.  It was the dates that we determined

18   that we wanted to do that event so, is that what

19   you're asking me?

20        Q  Let's see.  After you were terminated

21   from -- after the Federal Highway Administration

22   contract was terminated, did you have any formal

58

1      A   Yes.

2      Q   Did you all have a verbal subcontract

3   agreement, it just wasn't written down?

4      A   No.

5      Q   So what was your relationship then with

6   Tom Sawyer Productions?

7      A   We had a teaming agreement.

8      Q   So you were just teaming agreement only?

9      A   Right.

10      Q   And no other verbal -- no other oral or

11   verbal understanding whatsoever?

12      A   None.

13      Q   Do you know why the contract was canceled?

14      A   For convenience.

15      Q   Did you ever find out what convenience

16   meant?

17      A   No.  I'm not sure I know totally what it

18   means, but probably -- no.  You want to tell me?

19      Q   No, I don't know.  I want to ask you.  You

20   let me ask the questions and I'll be able to get this

21   done a lot more quickly.

22          Did you ever speak to anyone about the

61

1    level of service was a real prime concern.

2        Q   Did anyone at the Federal Highway

3    Administration tell you this?

4        A   Tell me?  No.

5        Q   Tell you that they did not feel that

6    Tom Sawyer Productions was not adequate to fulfill

7    the contract?

8        A   No, they told Tom Sawyer; they didn't tell

9    me.

10       Q   What did they tell Tom Sawyer?  Did they

11   tell them they didn't think they were adequate?

12       A   They discussed levels of service on

13   teleconference and in person.

14       Q   And were you on the teleconference to hear

15   these?

16       A   Yes -- not all of them, but one, yes, in

17   particular.

18       Q   Who was -- in that particular, who was

19   that particular persons that were on the phone?

20       A   There was a whole committee on the phone.

21       Q   Who would that committee have comprised?

22       A   I don't recall which particular person on

DEPOSITION OF MONICA BROWN
CONDUCTED ON MONDAY, JULY 23, 2007

62

1    the committee, but some of the people on the

2    committee would have been Theresa Banks,

3    Pamela Foster would have been on the call.  I can't

4    recall if Brenda was there or not or on vacation, but

5    those would be some of the people that were on the

6    call.  And then, of course, myself and Ms. Roy.  And

7    I don't know if -- and I would imagine counsel was on

8    the phone call as well.

9        Q   And this was just one phone call?

10       A   Yeah, that was one I was privy too, yes.

11   One that I have firsthand knowledge of.

12       Q   Do you recall about what time that

13   conversation took place, the phone conversation?

14       A   No, I don't recall exactly when.

15       Q   Was it before or after the cancellation of

16   the contract?

17       A   Prior.

18       Q   Has Ms. Roy ever told you why she thought

19   this contract was canceled?

20       A   She may have told me what she thought.

21       Q   What did she tell you?

22       A   I don't recall specifically what she

# EXHIBIT 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TOM SAWYER PRODUCTIONS, INC. | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| PROGRESIVE PARTNERS ACHIEVING | ) |
| SOLUTIONS, INC., *ET. AL.* | ) |
| | ) |
| **Defendants.** | ) |

### DECLARATION OF FREDERICK ISLER

FREDERICK ISLER, being duly sworn, deposes and says:

1) I Frederick Isler, am an adult citizen of the United States. I am competent to make the statements contained herein and am personally familiar with the facts surrounding the allegations in the above captioned case.

2) I currently work in the United States Department of Transportation, Federal Highway Administration. I am the Associate Administrator of the Office of Civil Rights.

3) In my capacity as Associate Administrator of the Office of Civil Rights, I was the manager of the FHWA Contract referred in the Complaint (the "Contract"). I am familiar with the facts and circumstances surrounding the decision to terminate that Contract.

4) As the Associate Administrator of the Office of Civil Rights and the manager of the Contract, I was the sole decision maker with regard to the determination of the need for the Contract, the final approval of the Contract and any decisions to terminate the Contract. No one else has the authority to make those decisions.

5) I terminated the Contract on September 6, 2006.

6) My decision to terminate the Contract on that day was not influenced in any way by the actions or inactions of either Progressive Partners Achieving Solutions, Inc. ("PPAS") or Renata Roy ("Roy"). As a matter of fact, my decision to terminate the FHWA contract had absolutely nothing to do with either PPAS or Roy at all.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my personal knowledge.

Frederick Isler

Date: July 26, 2007

# EXHIBIT 9

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## District of Columbia

TOM SAWYER PRODUCTIONS, INC

**SUMMONS IN A CIVIL CASE**

V.

PROGRESSIVE PARTNERS ACHEIVING
SOLUTIONS, INC, et al.

Case: 1:07-cv-01304
Assigned To : Collyer, Rosemary M.
Assign. Date : 7/23/2007
Description: General Civil

TO: (Name and address of Defendant)

RENATA ROV
12302 Longwater Dr.
Mitchellville, MD 20721

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

JONATHAN F.S. LOVE, ESQ.
3309 DUKE STREET
ALEXANDRIA, VA 22314

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

NANCY MAYER-WHITTINGTON                    JUL 23 2007
CLERK                                       DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | | DATE |
|---|---|---|
| Service of the Summons and complaint was made by me[1] | | July 23, 2007 |

| NAME OF SERVER *(PRINT)* | | TITLE |
|---|---|---|
| Jonathan F.S. Love | | |

*Check one box below to indicate appropriate method of service*

G   Served personally upon the defendant. Place where served:   **LAD Reporting**

    1100 Connecticut Ave., NW, Ste. 850, Washington, DC 20036

G   Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left: _____

G   Returned unexecuted: _____

G   Other (specify): _____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| N/A | N/A | N/A |

## DECLARATION OF SERVER

     I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on   7/24/2007       _____
           Date           Signature of Server   JONATHAN F.S. LOVE

           3309 Duke St., Alexandria, VA 22317
           Address of Server

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# EXHIBIT 10

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## District of Columbia

TOM SAWYER PRODUCTIONS, INC

**SUMMONS IN A CIVIL CASE**

v.

PROGRESSIVE PARTNERS ACHEIVING,
SOLUTIONS, INC., et al.

Case: 1:07-cv-01304
Assigned To : Collyer, Rosemary M.
Assign. Date : 7/23/2007
Description: General Civil

TO: (Name and address of Defendant)

PROGRESSIVE PARTNERS ACHEIVING
SOLUTIONS, INC.
12302 Longwater Dr.
Mitchellville, MD 20721

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

JONATHAN F.S. LOVE, ESQ.
3309 DUKE STREET
ALEXANDRIA, VA 22314

an answer to the complaint which is served on you with this summons, within ___20___ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

NANCY MAYER-WHITTINGTON
CLERK

JUL 23 2007
DATE

(BY) DEPUTY CLERK

07 25 2007  07:15pm   From                                                      T 100   P 002/002   F 770

AO 440 (Rev. 8/01) Summons in a Civil Action

| RETURN OF SERVICE | | |
|---|---|---|
| Service of the Summons and complaint was made by me[1] | DATE | July 23, 2007 |
| NAME OF SERVER *(PRINT)* Jonathan F.S. Love | TITLE | |

*Check one box below to indicate appropriate method of service*

G  Served personally upon the defendant.  Place where served:    LAD Reporting

1100 Connecticut Ave., NW, Ste. 850, Washington, DC 20036

G  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

G  Returned unexecuted: _____

G  Other (specify): _____

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL |

| DECLARATION OF SERVER |
|---|

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on  7/24/2007
_____
Date

_____
Signature of Server    JONATHAN F.S LOVE

3309 Duke St, Alexandria VA 22314
_____
Address of Server

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.